SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

### State of New Jersey v. Michael A. Maltese (A-96-13) (073584)

**Argued March 3, 2015 -- Decided August 17, 2015**

**SOLOMON, J., writing for a unanimous Court.**

In this appeal, the Court considers whether defendant's requests to speak with a family member during interrogation were sufficient to invoke his right to remain silent and, if so, whether his statements, and the physical evidence recovered as a result of those statements, should be suppressed.

In October 2008, after one of defendant's sisters had tried unsuccessfully to reach their parents, Michael and Kathleen Maltese, she called defendant and the police for assistance. On October 17, 2008, police were informed that the couple was missing and that unauthorized charges had been made to Kathleen Maltese's bank account. On October 18, 2008, police went to the Maltese residence, where defendant and his girlfriend, Nicole Taylor, resided with defendant's parents. At that time, police found shovels in the trunk of defendant's father's car. That same day, defendant agreed to go to the police station for questioning. After being read his Miranda rights, defendant told police that he had last seen his parents on October 10, 2008 when he dropped them off in Pennsylvania. After additional questioning, he told them that his parents had disappeared and admitted using his mother's bank card without her permission. The police arrested defendant for obstruction of justice and false swearing, but released him later that day.

On October 24, 2008, defendant returned to the police station for a polygraph test. After being read his Miranda rights, defendant took the test, in which he denied knowing his parents' whereabouts. After scoring the test, Sergeant (Sgt.) Paul Vallas told defendant that he had no doubt that he knew his parents' location. Defendant agreed to give a statement, but demanded that he talk to his uncle first. Sgt. Vallas advised him that was not in his best interest, but defendant continued to insist. Sgt. Vallas agreed, but before allowing them to speak, privately informed defendant's uncle that his nephew had failed the test, that he knew where his parents were, and that although defendant requested that the camera be turned off, the camera would actually be left on. Defendant's uncle agreed to help with the investigation. When Sgt. Vallas returned to the interview room, defendant asked if the conversation with his uncle would be protected under lawyer-client privilege. Sgt. Vallas replied that his uncle was not an attorney, but told him that he would turn off the camera. Defendant told his uncle that he knew where his parents' bodies were buried and that one other person was involved. After a short cigarette break, with a detective nearby, defendant returned to the interview room and received Miranda warnings for a second time. He admitted to police that, after a fight with his father on October 8, 2008, he strangled his parents and buried them in the woods behind Friendship Park. Defendant also said that Taylor helped dispose of their bodies. Police found the bodies buried in a shallow grave in Friendship Park.

Defendant was charged with two counts of murder, unlawfully disturbing, moving or concealing human remains, hindering apprehension or prosecution, theft, fraudulent use of a credit card, attempted theft, failing to dispose of human remains in a manner required by law, and tampering with physical evidence. One count of murder was subsequently amended to charge defendant with the passion/provocation manslaughter of his father. Defendant moved to suppress his statements to his uncle and police, as well as the evidence collected as a result of those statements. The trial court suppressed the statement to his uncle, but did not exclude his statement to police. At trial, the jury found defendant guilty of the manslaughter of his father, the murder of his mother, hindering prosecution, fraudulent use of a credit card, tampering with evidence, false swearing, and disturbing, moving, or concealing human remains. Defendant received an aggregate sentence of sixty-four years in prison, with an eighty-five percent period of parole ineligibility, pursuant to the No Early Release Act.

Defendant appealed, arguing that his statement to police should have been suppressed. The Appellate Division concluded that defendant invoked his right to remain silent by requesting that he speak to his uncle first, the police improperly recorded that conversation and, as such, the trial court properly suppressed the recorded conversation with his uncle. The Appellate Division further concluded, as did the trial court, that defendant's statement to police "was obtained voluntarily after the police re-administered defendant's Miranda rights." The Court granted certification. 217 N.J. 623 (2014).

**HELD**: Because defendant's statement to his uncle occurred after officers violated his Fifth Amendment right to remain silent, that statement is inadmissible. Defendant's subsequent statement to police was fruit of the unconstitutionally obtained statement to his uncle and must also be suppressed. Thus, defendant's convictions for manslaughter and murder are reversed. His other convictions are affirmed because they are supported by evidence independent of the suppressed statements. On remand, the trial court shall conduct a pretrial hearing to determine whether the physical evidence obtained as a result of defendant's suppressed statements is admissible under the inevitable discovery exception to the exclusionary rule.

1. The privilege against self-incrimination includes the right of a person to remain silent unless he chooses to speak of his own free will. Efforts by police to persuade a suspect to talk are proper as long as the will of the suspect is not overborne. The inquiry turns on whether an investigator's statements were so manipulative or coercive that they deprived defendant of his ability to make an autonomous decision to confess. Once a defendant unambiguously invokes his right to remain silent, interrogation must cease. Further, even when the suspect's invocation is ambiguous, officers are required to stop the interrogation completely, or to ask only questions narrowly directed to determine whether defendant is willing to continue. Of particular relevance to this matter, in State v. Harvey, 121 N.J. 407 (1990), this Court addressed a situation in which a defendant requested permission to speak with his father. There, the Court held that the defendant's request was sufficient to invoke his right to remain silent, and therefore required the interrogation to cease. As in Harvey, defendant here indicated that he wanted to speak with a family member to obtain advice before proceeding with questioning. Considering the circumstances, defendant affirmatively asserted his right to remain silent. Therefore, the statement he made to his uncle was obtained in violation of his Fifth Amendment right to remain silent and was properly suppressed by the trial court. (pp. 20-22)

2. The United States Supreme Court has concluded that the admissibility of statements obtained after the person in custody has decided to remain silent depends on whether his right to cut off questioning was scrupulously honored. Michigan v. Mosley, 423 U.S. 96, 104 (1975). There, the Court focused on four factors: (1) two hours passed after the defendant first asserted his right to remain silent; (2) the defendant received fresh Miranda warnings before the interrogation resumed; (3) the defendant was questioned by a different police officer; and (4) the defendant was questioned about a different crime. Here, the break in questioning was less than seven minutes, defendant was always in the presence of an officer, and the officers who took defendant's statement were known by defendant to be conducting the investigation. Additionally, after defendant confessed to his uncle, police made it clear that they knew about that confession. Considering these factors, the statement to police was the fruit of the unconstitutionally obtained statement to his uncle. (pp. 22-27)

3. As for whether the admission of defendant's statement to police constituted harmless error, the Court notes that all of his convictions, with the exception of the convictions for manslaughter and murder, were independently substantiated by evidence other than his statement to police. However, because that statement was particularly relevant to the manslaughter and murder convictions, the Court cannot conclude that the statement's admission was harmless. Therefore, while his other convictions are affirmed, his manslaughter and murder convictions are reversed and the matter is remanded for retrial. On retrial, the statements may be used for impeachment purposes if defendant chooses to testify.

4. Finally, as the record now exists, the State has not met its burden to establish that normal police procedures would have inevitably led to discovery of the bodies. Therefore, on remand, the court must determine whether the physical evidence discovered because of defendant's statements should also be suppressed. (pp. 28-33)

The judgment of the Appellate Division is **AFFIRMED** in part and **REVERSED** in part. The matter is **REMANDED** to the trial court for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA; and JUDGE CUFF (temporarily assigned) join in JUSTICE SOLOMON's opinion.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

MICHAEL A. MALTESE,

    Defendant-Appellant.


        Argued March 3, 2015 – Decided August 17, 2015

        On certification to the Superior Court, Appellate Division.

        Elizabeth C. Jarit, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ms. Jarit, Robert J. Kipnees, and Natalie J. Kraner, Designated Counsel, on the briefs).

        Jane C. Schuster, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney).


    JUSTICE SOLOMON delivered the opinion of the Court.

    In this appeal, we must determine whether defendant's repeated requests to speak with a family member during interrogation was sufficient to invoke the right to remain silent and, if so, whether defendant's subsequent statements and

1

physical evidence recovered as a result of those statements should be suppressed.

We conclude that defendant, Michael Maltese, asserted his Fifth Amendment right to remain silent before any admissions were made. Because defendant's surreptitiously recorded statement to his uncle occurred after officers violated defendant's right to remain silent that statement is inadmissible. We further conclude that defendant's following statement to law enforcement officers was the fruit of the unconstitutionally obtained statement to defendant's uncle, and must also be suppressed. The State will be allowed to use defendant's statements on cross-examination for impeachment if defendant chooses to testify at trial.

Therefore, we reverse defendant's convictions for second-degree passion/provocation manslaughter of his father, Michael Maltese, N.J.S.A. 2C:11-4(b)(1)-(2); and first-degree murder of his mother, Kathleen Maltese, N.J.S.A. 2C:11-3(a)(1)-(2). On remand, the trial court shall conduct a hearing to determine whether the evidence obtained as a result of defendant's statements -- the whereabouts of the victims' remains -- is admissible under the inevitable-discovery exception to the exclusionary rule.

However, we affirm defendant's convictions for second-degree disturbing, moving or concealing human remains, N.J.S.A.

2C:22-1(a)(1); fourth-degree tampering with evidence, N.J.S.A. 2C:28-6(1); third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1); third-degree theft by unlawful taking, N.J.S.A. 2C:20-3; third-degree fraudulent use of a credit card, N.J.S.A. 2C:21-6(h); and fourth-degree false swearing, N.J.S.A. 2C:28-2(a); because those convictions are supported by evidence independent of the suppressed statements.

## I.

### A.

The record before us reveals the following. On October 11, 2008, a relative attempted to contact defendant's mother, but was unable to do so. That relative notified defendant's sister, Leela Parent, who unsuccessfully attempted to contact her parents. Subsequently, Parent called defendant, other family members, hospitals, and police stations in an attempt to locate her parents.

On October 17, 2008, defendant and another sister, Ricky Lee Fodor, reported their parents missing to the South Brunswick Police Department. Also, Parent told police that unauthorized charges had been made to a joint bank account she held with her mother. The police investigation revealed that the account's bank card had been used to make cash withdrawals and numerous charges between October 10, 2008, and October 13, 2008.

Thereafter, police obtained video footage from the bank that showed defendant using the bank card to make a withdrawal.

On October 18, 2008, Detective James Ryan of the North Brunswick Police Department and Investigator James Mullin of the Middlesex County Prosecutor's Office went to the Maltese residence, where, in addition to defendant's parents, defendant resided with his girlfriend, Nicole Taylor. Detective Ryan walked through the home, and searched the automobile owned by defendant's father.[1] Detective Ryan discovered shovels in the trunk of the car, and had the vehicle impounded for further investigation.

On the same day, defendant, Taylor and Fodor agreed to go to the police station for questioning. At the police station, defendant was read his Miranda rights, and agreed to provide a statement, which was videotaped. Although defendant initially maintained that he last saw his parents when he dropped them off in New Hope, Pennsylvania on October 10, 2008, he stated later that his parents had disappeared and admitted to using his mother's bank card without her permission.[2] The police arrested defendant for obstruction of justice and false swearing, but released him later that day. The next day, Parent provided to

---

[1] This search is not challenged in this appeal.
[2] The statements given by defendant to police on October 18 are not at issue here.

4

police receipts she found in her parents' home for the transactions that were charged using the bank card for the joint account she held with her mother.

On October 24, 2008, defendant agreed to go to the police station a second time, and to submit to a polygraph test. Before administering the polygraph examination, Sergeant Paul Vallas of the New Jersey State Police engaged defendant in conversation, asked preliminary questions in preparation for the test, and read defendant his <u>Miranda</u> rights. During the polygraph examination, defendant denied knowing his parents' whereabouts.

After "scoring" the polygraph test, Sergeant Vallas told defendant that, "no doubt . . . you know exactly where your mother and father are right now." Sergeant Vallas then told defendant that members of his family were at the station and needed to know "exactly where the bodies are." The following exchange ensued.

> DEFENDANT: I feel at this point I have to talk to my uncle. I need to talk to my uncle.
>
> . . . .
>
> VALLAS: What exactly do you want to talk to your uncle about?
>
> DEFENDANT: I don't know where to go, what to do from here.
>
> VALLAS: Okay. I hear what you're saying.

5

. . . .

VALLAS: Okay, and, obviously, you know and I know they've been on your back knowing what the results were going to be, okay? So, . . . before you go sit out there and talk to your parent -- your uncle, let's get this clarified, as you're sitting here --

DEFENDANT: I'd like to talk to my uncle first.

VALLAS: As you're sitting here, as you're sitting here with your feet flat on the ground . . . [y]ou're thinking to yourself, I want to tell them. No doubt about it. And when you think to yourself and you realize it's the right thing to do, just go ahead and say it. So why don't we just clear the air now. Let's just clear the air now.

DEFENDANT: I'd like to talk to my uncle first.

Sergeant Vallas replied that, while he could "understand" why defendant wanted to speak to his uncle, "what we gotta do right now is clarify this" because defendant owed the family an explanation as to what happened. Sergeant Vallas further explained that "just throwing it out to them raw isn't going to be a good thing, . . . you need a buffer." Defendant again asked to speak with his uncle first, and the exchange continued.

VALLAS: I understand what you're saying.

DEFENDANT: I don't think you do.

VALLAS: No, I do. No, I do understand what you're saying, I do.

DEFENDANT: I want his opinion.

VALLAS: His opinion as far as what?

6

DEFENDANT: As far as what I do. You're saying I failed [the polygraph].

. . . .

VALLAS: That's no longer an issue. . . . Now it's just a question of you pointing out where they are. . . . Your uncle is going to say to you tell them the truth, tell them where the bodies are at, that's what your uncle is going to tell you.

DEFENDANT: I'd like to talk to my uncle.

VALLAS: I understand what you're saying to me.

DEFENDANT: Or if you're not going to let me do that --[3]

VALLAS: No, no, no, no, listen, listen, listen. Understand something, what I've made perfectly clear --

DEFENDANT: Um-hum.

VALLAS: -- when we first walked in here, is that you're free to leave here at any time, but you gotta understand something here, though, alright? What we got here is . . . a very serious situation. Would you agree with me?

DEFENDANT: Yeah.

. . . .

VALLAS: I understand what you're saying, but the point being here is this is the opportunity for you to sit down here and tell me what the truth is. Do you see what I'm saying? This is your opportunity --

DEFENDANT: And I might just do that.

---

[3] The record is unclear as to what defendant was about to say before being interrupted by Sergeant Vallas.

7

VALLAS: Okay, well, listen --

DEFENDANT: But I'd like to talk to my uncle first.

Sergeant Vallas then advised defendant that it was not in defendant's "best interest" to speak to his uncle because they could not be sure of his uncle's reaction. He further urged defendant to tell the truth to give his sisters "the opportunity to have closure" or for "nothing else, for your mother, okay?" Defendant again insisted on speaking with his uncle.

DEFENDANT: I do, I gotta talk to him.

VALLAS: I know you gotta talk to your uncle, and you're gonna have a chance to talk to your uncle, no doubt about it.

DEFENDANT: What it comes down to, as far as it goes, I can't say anything to anybody before [I] talk to him, you know what I mean? If it's going the way that it's looking like it's going, I'm telling him first.

Still, Sergeant Vallas did not end the interrogation. Defendant explained that he considered his uncle "even better than a freaking attorney." When Sergeant Vallas asked why defendant would not speak with him, defendant replied, "I met you today," and the questioning continued.

VALLAS: Okay. So what you're saying to me is that there's no doubt it happened, it's a question of whether or not you're going to take us to the location or not, is that what it is?

DEFENDANT: No, I'm saying that before anything else happens I want to talk to my uncle.

8

> VALLAS: Okay.  And then what?
>
> DEFENDANT: And then we'll go from there.
>
> . . . .
>
> VALLAS: So when your uncle walks in here and he says take us to where the bodies are, are you taking us to the bodies?
>
> DEFENDANT: If he said that?  Um, I don't know what to say, you know, I don't know what to say, but I'd like to talk to him.

Nevertheless, Sergeant Vallas continued to query defendant, who again asserted that he would not speak with Sergeant Vallas before he spoke with his uncle.  Sergeant Vallas finally agreed, then left the room to call a prosecutor to "make sure" that the camera could be left on while defendant's uncle was in the interview room with defendant.  The prosecutor advised that as long as defendant's uncle knew that the camera was on, the officers could record the conversation.  Sergeant Vallas told defendant's uncle that defendant had failed the polygraph test, that he knew where his parents were, and that although defendant requested that the camera be turned off, the camera would actually be left on.  Defendant's uncle agreed to help with the investigation.

Sergeant Vallas returned to the interview room, and told defendant that he would shut off the camera.  Sergeant Vallas also stated that defendant's uncle was aware of "the results of

9

the polygraph exam," and knew defendant was responsible for his parents' disappearance. Defendant asked if his conversation would be "protected under lawyer, lawyer-client privilege? . . . . You know what I mean? You're not allowed to listen to somebody consult with their lawyer kind of thing?" Sergeant Vallas replied that defendant's uncle was "not an attorney," but nonetheless the camera would be turned off.

Investigator Mullin watched and listened to defendant's conversation with his uncle from the observation room. Defendant admitted to his uncle that he knew where his parents' bodies were buried and that "only one other" person was involved. Investigator Mullin then heard defendant and his uncle mention going someplace else to talk, and called the prosecutor again to ask whether defendant and his uncle should be left alone to speak in private. The prosecutor told Investigator Mullin not to let defendant and his uncle go outside to smoke a cigarette and to "make sure" that they spoke in the room. Nevertheless, defendant was permitted to step outside with his uncle to smoke a cigarette with Detective Ryan nearby.

After reentering the interview room and receiving Miranda warnings for a second time, defendant admitted to Detective Ryan and Investigator Mullin that he and his father had a fight on October 8, 2008, and that he had strangled his parents and

10

buried them in the woods behind Friendship Park.  Initially, defendant denied that Taylor was involved, but later admitted that she had helped dispose of his parents' bodies.  The police discovered the bodies buried in a shallow grave in Friendship Park.

B.

A grand jury returned an indictment charging defendant with the following:  two counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1); third-degree theft by unlawful taking, N.J.S.A. 2C:20-3; third-degree fraudulent use of a credit card, N.J.S.A. 2C:21-6(h); third-degree attempted theft, N.J.S.A. 2C:5-1 and 2C:20-3; and fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1).  One count of first-degree murder was subsequently amended to charge passion/provocation manslaughter of defendant's father, N.J.S.A. 2C:11-4(b)(1)-(2).  Co-defendant Taylor was charged in the same indictment.  The grand jury returned a separate indictment charging defendant with second-degree unlawfully disturbing, moving or concealing human remains, N.J.S.A. 2C:22-1(a)(1), and third-degree failing to dispose of human remains in a manner required by law, N.J.S.A. 2C:22-1(b).

Defendant filed a motion to suppress both his statement to his uncle and his statement to Detective Ryan and Investigator

Mullin, as well as the evidence collected as a result of those statements. The trial court, after hearing testimony from Sergeant Vallas, Detective Ryan, and Investigator Mullin and reviewing a recording of defendant's statements, suppressed defendant's statement to his uncle, but did not exclude defendant's statement to police. The court determined that defendant, by asking to speak to a close relative, effectively asserted his right to remain silent, and that defendant's statement to his uncle was not freely and voluntarily made because the police misrepresented that the camera would remain off while defendant spoke to his uncle.

However, in finding defendant's statement to police admissible, the trial court determined that the police scrupulously honored defendant's initial request to remain silent. The court noted that the officers administered <u>Miranda</u> warnings a second time, and permitted defendant to take "a break to speak to his uncle," and smoke a cigarette. Further, defendant "was questioned by different officers, and expressed a willingness to provide a statement."

> [D]efendant appeared calm, relaxed, and eager to tell his story . . . . [T]hroughout the entire questioning of the defendant there were no threats, bribes, or other inducement that would coerce defendant to confess or lead the [c]ourt to question the reliability of the defendant's statements.

12

Thus, the court concluded that, with respect to the statement to Detective Ryan and Investigator Mullin, defendant voluntarily waived his right to remain silent. The court did not consider whether the prior statement to defendant's uncle impacted the admissibility of the statement to police.

At trial, the prosecution played for the jury defendant's statement to Investigator Mullin and Detective Ryan. Additionally, Taylor testified that she restrained defendant's mother until defendant finished strangling his father, at which point defendant strangled his mother. Taylor explained that, after both parents were dead, defendant and Taylor removed the clothing from the bodies, placed them into a bathtub filled with bleach, rolled the bodies into garbage bags, placed them into the trunk of defendant's father's car, and drove the car to Friendship Park. Once they arrived, defendant and Taylor dug a shallow grave and buried the bodies. Taylor also testified about some of the purchases she witnessed defendant make on the bank card following the murders.

Defendant testified on his own behalf. He claimed to have killed his father in self-defense, and that Taylor, not he, killed his mother.

The jury found defendant guilty of second-degree passion/provocation manslaughter of his father; first-degree murder of his mother; third-degree hindering prosecution; third-

13

degree theft; third-degree fraudulent use of a credit card; fourth-degree tampering with evidence; fourth-degree false swearing; and second-degree disturbing, moving or concealing human remains. Defendant received an aggregate sentence of sixty-four years in prison, with an 85% period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Defendant appealed, arguing that his statement to Investigator Mullin and Detective Ryan should also have been suppressed. Defendant argued the statement to his uncle was involuntary, the subsequent statement to police was tainted by the first involuntary statement to defendant's uncle, and the evidence recovered as a result of the statements should also have been suppressed.

The Appellate Division concluded that defendant initially invoked his right to remain silent by requesting to speak to his uncle, the police improperly recorded that conversation and, as such, the trial court properly suppressed the recorded conversation with defendant's uncle. The Appellate Division concluded, as did the trial court, that defendant's statement to police "was obtained voluntarily after the police re-administered defendant's Miranda rights."

We granted certification on the issue of whether defendant's statement to police was tainted by the improperly

14

obtained statement to defendant's uncle, and therefore should have been suppressed as the fruit of the poisonous tree. State v. Maltese, 217 N.J. 623 (2014).

## II.

### A.

Relying on the trial court's finding that the police violated defendant's right to remain silent by continuing to question him after he asked to speak with his uncle, defendant argues that his statement to police "should have been suppressed as part and parcel of prior unconstitutional interrogation procedures or, alternatively, as the fruit of the poisonous tree." Defendant claims that the entire event constituted a single interrogation, which became constitutionally defective when Sergeant Vallas continued to interrogate defendant for ten minutes after he first invoked his right to remain silent. In support of that argument, defendant asserts that: he was never free from police observation; he made his inculpatory statement to police less than seven minutes after he spoke with his uncle; Investigator Mullin was involved in orchestrating the State's recording of defendant's conversation with his uncle in the interview room; and Detective Ryan interviewed defendant previously, coordinated the polygraph test, and led defendant into the interview room. Moreover, defendant argues, that the officers themselves believed the event was one continuous

15

interview, as is apparent from Investigator Mullin's testimony that defendant's uncle "was happy to continue the investigation" and by the fact that the officers used information learned from defendant's statement to his uncle during the second half of the interrogation.

Defendant argues that the officers' repetition of Miranda warnings does not constitute an intervening event between his admissions to his uncle and his statement to police because the investigating officers failed to explain that defendant's prior admissions to his uncle could be used against him. Additionally, defendant asserts that his will to resist providing the statement to police was overcome by the interviewing officers' use of the information he told his uncle.

Defendant next asserts that the physical evidence uncovered as a result of the involuntary statement to police -- the bodies of defendant's parents -- should have been suppressed as fruit of the unlawful statements. Defendant notes that "the location where the victims were buried was nondescript, with no markings that would have alerted them to the burial location," and that there was no evidence that the officers could have discovered the physical evidence without defendant's statement to police.

Finally, defendant argues that his statement to police was crucial to the State's case against him -- it was used both as substantive evidence and for impeachment -- and as such, the

16

admission was not harmless error, and a reversal of his convictions and remand for a new trial is warranted.

B.

The State contends that defendant's request to speak to his uncle does not qualify as an invocation of the right to remain silent. Further, the State argues that the officers' misrepresentation that the camera would be off during defendant's conversation with his uncle did not render defendant's statement to police involuntary because defendant did not rely on that misrepresentation. The State notes that defendant asserted that he did not "trust" that the camera was off, and Sergeant Vallas explained to defendant that the conversation was not protected by attorney-client privilege.

The State also argues that, even if defendant had invoked his right to remain silent, that right was scrupulously honored before defendant confessed to police. The State notes that Sergeant Vallas allowed defendant to speak with his uncle before the interrogation resumed, allowed defendant to leave the interrogation room for a cigarette break, and administered fresh Miranda warnings.

Next, in reliance on Taylor's testimony and the physical evidence in support of defendant's conviction, the State asserts that admission of defendant's statement to the police was, at most, harmless error. The State contends that police would have

17

inevitably discovered the physical evidence because the manner of burial and location of the victims' remains was susceptible to discovery, and Taylor knew the location of the bodies.

Additionally, the State asserts that this Court's grant of certification was sufficient to permit the State to challenge the underlying reasons for the decision below. The State argues that defendant was not in custody when he asked to speak to his uncle and, therefore, the protections of Miranda do not apply.[4]

### III.

We begin our analysis by considering our scope of review. "When faced with a trial court's admission of police-obtained statements, an appellate court should engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." State v. Hreha, 217 N.J. 368, 381-82 (2014) (quoting State v. Pickles, 46 N.J. 542, 577 (1966)). We do not independently assess evidence as if we are the trial court. Id. at 382. Rather, "an appellate court

---

[4] This argument was raised for the first time in the State's reply to defendant's petition for certification, and was not the subject of a cross-petition. It was not raised before the trial court, and therefore the trial court made no factual findings as to this argument. We acknowledge that in deciding the issues presented, this Court has the discretion to address matters not raised in a petition for certification. Pfenninger v. Hunterdon Cent. Reg'l High Sch., 167 N.J. 230, 235 n.1 (2001). However, in light of the foregoing, we decline to exercise that discretion here.

18

should typically defer to the trial court's credibility and factual findings" because such findings are "often 'substantially influenced by [its] opportunity to hear and see the witnesses and to have the "feel" of the case.'" Ibid. (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

To warrant reversal, defendant must show not only that admission of his statement was error, but that it was error "of such a nature to have been clearly capable of producing an unjust result." R. 2:10-2. In cases in which admitted evidence implicates a constitutional right, the reviewing court must determine whether the alleged error was "'harmless beyond a reasonable doubt.'" State v. Weaver, 219 N.J. 131, 154 (2014) (quoting Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705, 710-11 (1967)); see State v. Sanchez, 129 N.J. 261, 278-79 (1992) (holding admission of confession was harmful error because it was "uncertain whether the error may have contributed to defendant's conviction").

IV.

A.

With an understanding of our scope of review, we turn to the question of whether during questioning defendant asserted his Fifth Amendment right to remain silent. Although the New Jersey Constitution contains no reference to the privilege

19

against self-incrimination, we have repeatedly held "that it is a right 'so venerated and deeply rooted in this state's common law that it has been deemed unnecessary to include the privilege in our State Constitution.'" State v. Diaz-Bridges, 208 N.J. 544, 563 (2012) (quoting State v. O'Neill, 193 N.J. 148, 176 (2007)). Indeed, our decisions have been more solicitous of this privilege than decisions under the federal constitution alone. Id. at 563-64.

The privilege includes "'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own free will, and to suffer no penalty . . . for [] silence.'" State v. Camacho, 218 N.J. 533, 543 (2014) (quoting State v. P.Z., 152 N.J. 86, 100-02 (1997)). Efforts by a law enforcement officer to persuade a suspect to talk "are proper as long as the will of the suspect is not overborne." State v. Miller, 76 N.J. 392, 403 (1978). The inquiry turns on "whether an investigator's 'statements were so manipulative or coercive that they deprived [defendant] of his ability to make an unconstrained, autonomous decision to confess.'" State v. DiFrisco, 118 N.J. 253, 257 (1990) (alteration in original) (police officer's encouragement of trust did not render confession involuntary) (quoting Miller v. Fenton, 796 F.2d 598, 605 (3d Cir.), cert. denied, 479 U.S. 989, 107 S. Ct. 585, 93 L. Ed. 2d 587 (1986)).

In the context of custodial interrogation, once a defendant clearly and unambiguously invokes his right to remain silent, interrogation must cease.  Diaz-Bridges, supra, 208 N.J. at 564 (citing State v. Johnson, 120 N.J. 263, 281 (1990)).  Because a police officer must "scrupulously honor[]" that right, even when the suspect's invocation is "ambiguous," officers are "required to stop the interrogation completely, or to ask only questions narrowly directed to determining whether defendant [is] willing to continue."  Johnson, supra, 120 N.J. at 284; see also State ex rel. A.S., 409 N.J. Super. 99, 116-17 (App. Div. 2009) (finding juvenile's "statement that she did not know whether she wished to speak to [an officer], her evident reluctance thereafter to speak, and the long silences . . . suggest[ed] at least an equivocal invocation of the right to silence, warranting further inquiry by [the officer]"), rev'd on other grounds, 203 N.J. 131 (2010).

Whether a suspect has invoked his right to remain silent requires analysis of the totality of the circumstances, including consideration of the suspect's words and conduct.  Diaz-Bridges, supra, 208 N.J. at 568-69.  The defendant's statement is evaluated in the full context in which the statement is made, including whether the suspect wished to speak to another person in order to seek advice or as a condition before speaking with police.  See State v. Martini, 131 N.J.

21

176, 231-33 (1993).  Of particular relevance to this matter, this Court in State v. Harvey, 121 N.J. 407 (1990), addressed a situation where a defendant requested to speak to someone other than an attorney.  In Harvey, we held that the defendant's statement that "he would tell [the officers] about the murder" after he spoke with his father was sufficient to invoke his right to remain silent, and therefore required the interrogation to cease.  Id. at 417, 420.

The facts presented here clearly indicate that defendant invoked his right to remain silent.  Defendant voluntarily went to the police station and initially appeared willing to answer Sergeant Vallas's questions.  However, once Sergeant Vallas informed defendant that he had failed the polygraph test and demanded that defendant tell him where his parents were, defendant repeatedly stated that he wanted to speak with his uncle, whom he considered "better than a freaking attorney," before answering any further questions.

As in Harvey, defendant here indicated that he wanted to speak with a family member to obtain advice before proceeding with questioning.  Unlike Diaz-Bridges, supra, 208 N.J. at 548-49, where the defendant failed to indicate that he wanted questioning to stop, defendant here unequivocally asserted more than ten times that he wanted to speak to his uncle before answering any further questions.  Additionally, unlike State v.

Brooks, 309 N.J. Super. 43, 52-57 (App. Div. 1998), defendant specifically stated that he wanted to consult with his uncle about "what to do."

Considering all the circumstances, we conclude that defendant affirmatively asserted his right to remain silent when confronted with the results of the polygraph. Once his Fifth Amendment right was asserted, the interrogation nonetheless continued when police engaged defendant's uncle to assist them in the investigation; the information learned from recording defendant's conversation with his uncle followed Sergeant Vallas's misrepresentation that "as soon as I open this door, the recording is going to be going off." The trial court found that defendant confessed as a direct result of the false promise that the recording device would be off. Under those circumstances, defendant's Miranda rights were not scrupulously honored. Therefore, defendant's statement made to his uncle was obtained in violation of defendant's Fifth Amendment right to remain silent and was properly suppressed by the trial court.

B.

Having determined that defendant's statement to his uncle was obtained in violation of defendant's assertion of his right to remain silent and was properly suppressed by the trial court, we must now resolve whether defendant's statement to Detective Ryan and Investigator Mullin also should be suppressed.

The United States Supreme Court concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Michigan v. Mosley, 423 U.S. 96, 104, 96 S. Ct. 321, 326, 46 L. Ed. 2d 313, 321 (1975). In determining that the defendant's right to silence was scrupulously honored, the Court in Mosley focused on four factors: (1) two hours passed after the defendant first asserted his right to remain silent; (2) the defendant received fresh Miranda warnings before the interrogation resumed; (3) the defendant was questioned by a different police officer; and (4) the defendant was questioned about a different crime. Id. at 106, 96 S. Ct. at 327, 46 L. Ed. 2d at 322; see Oregon v. Elstad, 470 U.S. 298, 310, 105 S. Ct. 1285, 1293, 84 L. Ed. 2d 222, 232-33 (1985) (explaining that where statement is coerced, "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession"); see also State v. Hartley, 103 N.J. 252, 266-67 (1986) (discussing Mosely factors and requiring fresh Miranda warnings before resuming questioning). In this case, the break in questioning was less than seven minutes, defendant was always in the presence of an

24

officer, and the officers that took defendant's statement were known by defendant to be conducting the investigation.

Additionally, after defendant confessed to his uncle, Investigator Mullin and Detective Ryan made it clear that they knew defendant "let the cat out of the bag,"[5] and therefore, "no matter what the inducement," he was not "free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag." O'Neill, supra, 193 N.J. at 171 n.13 (quoting United States v. Bayer, 331 U.S. 532, 540-41, 67 S. Ct. 1394, 1398, 91 L. Ed. 1654, 1660 (1947)). Under those circumstances, "a later confession always may be looked upon as fruit of the first." Ibid.

In determining whether this taint is attenuated, the Court considers the following factors: "the time between confessions, any intervening circumstances, whether there was a change in place, whether defendant received an adequate warning of his rights, whether the defendant initiated the second confession, the effect of his having previously made a confession, and the 'purpose and flagrancy of police misconduct.'" Hartley, supra, 103 N.J. at 283 (quoting Brown v. Illinois, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 2261-62, 45 L. Ed. 2d 416, 427 (1975)); see,

---

[5] Detective Ryan stated, "Jim [Mullin] is totally up to speed and everything, but I just want to go over -- your mom and dad are deceased, correct?"

25

e.g., Harvey, supra, 121 N.J. at 417-18 (holding second confession sufficiently independent such that taint of illegal conduct dissipated where statement was given two days after alleged violation, defendant was not subjected to prolonged detention, and intervening circumstances separated alleged violation from confession).

In Hartley, supra, federal agents, without giving Miranda warnings, interrogated the defendant about ten minutes after state police officers met with the defendant, and he asserted the right to remain silent. 103 N.J. at 258-59. This Court held that, "whether seen as produced by the same interrogation process as the first or, even though separate, as tainted by the first," the second confession was inadmissible. Id. at 284. The Court noted the interrogations occurred "in the same room," the federal agents who conducted the second interview were involved in the investigation with state officers who conducted the first, and the second interview occurred close "on the heels" of the first interrogation. Id. at 279-80. Thus, we concluded that the two interrogations "comprise[d] a single continuing event." Id. at 279; cf. State v. Chew, 150 N.J. 30, 67-68 (1997) (holding five hours and twenty minutes between two statements sufficient "so that they were not part of the same . . . interrogation.")

During his recorded meeting with his uncle, defendant confessed to the murders of his parents. Approximately seven minutes later, officers initiated another interview of defendant, administered Miranda warnings a second time, and immediately gave a clear indication that they knew defendant confessed to his uncle that he killed his parents. All of the questioning was conducted in the same interview room; the statement to police was obtained by officers who defendant knew were involved in the investigation; and all of the questioning and discussion concerned the same crimes. We determine that, under these facts, the statement to police was the "fruit" of the unconstitutionally obtained statement to defendant's uncle. Once defendant "let the cat out of the bag by confessing, no matter what the inducement, he [was] never thereafter free of the psychological and practical disadvantages of having confessed. He [could] never get the cat back in the bag." O'Neill, supra, 193 N.J. at 171 n.13 (citing Bayer, supra, 331 U.S. at 540-41, 67 S. Ct. at 1398, 91 L. Ed. at 1660). Under the facts of this case, not even the second reading of Miranda warnings removed the taint of the first constitutional violation.

V.

Having preliminarily excluded defendant's statements, we must now determine whether the admission of defendant's

statement to police at trial amounted to harmless error beyond a reasonable doubt.

The theft, fraudulent use of the bank card, hindering, and false swearing convictions were independently substantiated. In fact, those convictions were not dependent in any way on the statement made by defendant to police. The State offered, and the trial court admitted into evidence, the receipts, videotaped recordings of defendant using the bank card, and bank records from the account to substantiate those charges. The hindering prosecution conviction was for giving false information regarding the whereabouts of defendant's parents and when they were last seen alive, as evidenced by the October 18, 2008, statement to police, which occurred before defendant made the statements at issue here.

Likewise, the tampering with physical evidence and concealment convictions were independently substantiated by Taylor's testimony at trial. Taylor testified about the manner in which she and defendant put the bodies in the tub, and then transported the bodies to the park and buried them.

By contrast, defendant's statement to police was particularly relevant to defendant's passion/provocation manslaughter and murder convictions. Based on the passion/provocation manslaughter conviction, the jury credited defendant's statement to police supported by Taylor's trial

28

testimony, which was contrary to defendant's testimony at trial that he acted in self-defense. We acknowledge that defendant's murder conviction is supported by Taylor's trial testimony, and the medical examiner's trial testimony that the manner of death and injuries to the two victims was similar. However, the State used defendant's statement to police to contradict his testimony that Taylor was responsible for the death of defendant's mother, and was successful in obtaining a conviction against defendant for his mother's murder.

Because the passion/provocation manslaughter and first-degree murder convictions were substantially dependent upon defendant's statement to police, we cannot conclude that admission of the statement at trial was harmless beyond a reasonable doubt. As such, defendant's passion/provocation manslaughter and first-degree murder convictions must be reversed and the matter must be remanded for retrial.

Although we have concluded that defendant's unconstitutionally obtained statements must be excluded, on retrial, those statements may be used for impeachment purposes. In reaching this conclusion, we rely upon our holding in State v. Burris, 145 N.J. 509 (1996), in which the defendant was charged and convicted of, among other things, murdering her mother. Id. at 517. After giving a statement to police denying responsibility for her mother's death, the defendant asked for a

lawyer, and despite refusing to answer any more questions, police continued the interrogation and obtained two more statements connecting the defendant to the homicide.  Id. at 516.  This Court excluded the evidence in the State's case-in-chief, but permitted its use to cross-examine the defendant if she chose to testify.  Id. at 532-33, 538.  After considering the totality of the circumstances, we allowed the statements to be used for impeachment, stating that "[t]he impeachment exception is strictly limited to situations in which the suppressed statement is trustworthy and reliable in that it was given freely and voluntarily without compelling influences." Id. at 525.

Here, defendant was twenty years old and had a high school diploma.  The interrogation lasted approximately seven hours, and defendant was twice advised of his constitutional rights. Defendant was not subjected to physical punishment and, although he acknowledged he was tired, did not appear to be in physical distress as a result of the length or manner of the interrogation.  Under these circumstances, as in Burris, we conclude that defendant's statements may be used by the State to impeach defendant if he chooses to testify at retrial.

VI.

On remand, a determination must be made whether the physical evidence discovered directly because of defendant's

30

statements -- the victims' remains -- should also be suppressed pursuant to the exclusionary rule.

If the State can show that "the information ultimately or inevitably would have been discovered by lawful means . . . the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." Nix v. Williams, 467 U.S. 431, 444, 104 S. Ct. 2501, 2509, 81 L. Ed. 2d 377, 387-88 (1984). Under the "inevitable discovery" doctrine, the State must "show by clear and convincing evidence" the following:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [Johnson, supra, 120 N.J. at 289 (citing State v. Sugar, 100 N.J. 214, 238 (1984)(Sugar II).]

However, under this standard, "the State need not demonstrate the exact circumstances of the evidence's discovery . . . . It need only present facts sufficient to persuade the court, by a clear and convincing standard, that the [evidence] would be discovered." State v. Sugar, 108 N.J. 151, 158 (1987).

The State, in its supplemental brief, asserts that the officers would have inevitably discovered the bodies because

31

they were buried in a shallow grave and because Taylor also knew the location of the burial site. The State has not provided any evidence that the bodies would have been discovered because of the way they were buried, or that Taylor would have led them to the remains. As the record now exists, the State has not met its burden to establish by clear and convincing evidence that normal police procedures would inevitably have led to discovery of the bodies. Cf. id. at 157-58, 161 (concluding body buried in defendant's backyard would have been inevitably discovered because body was buried in shallow grave and would have given off detectable odor, defendant contracted to sell home and purchasers, who owned a dog, testified that they would have done work in that portion of yard, and it would have been obvious to anyone observing the site that something was abnormal); Johnson, supra, 120 N.J. at 290 (concluding evidence inside home would have been inevitably discovered where police testified they were preparing search warrant for premises); State v. Finesmith, 406 N.J. Super. 510, 523 (App. Div. 2009) (concluding laptop admissible where police detective testified to specific steps he would have taken to uncover evidence).

The record reveals that the victims' bodies were discovered solely as a result of defendant's statements made in violation of his Fifth Amendment right to remain silent. It is possible that Taylor's testimony will establish that she would have led

police to the victims' bodies because she had knowledge of their location, or that the way the bodies were buried might have led to their discovery. However, that evidence is not present in the record before us, and the State had no reason to press the issue in light of the trial court's decision to admit defendant's statement to Detective Ryan and Investigator Mullin. As such, we remand for a hearing to determine whether the bodies would have been discovered inevitably. See Sugar II, supra, 100 N.J. at 240 (remanding for factual determination for whether evidence would have been inevitably discovered).

## VII.

For the reasons set forth above, we affirm defendant's convictions for second-degree disturbing, moving or concealing human remains, fourth-degree tampering with evidence, third-degree hindering apprehension or prosecution, third-degree theft, third-degree fraudulent use of a credit card, and fourth-degree false swearing, and reverse and remand for retrial the charges of passion/provocation manslaughter and first-degree murder. On remand, the trial court shall conduct a pretrial hearing to determine whether the physical evidence obtained as a result of defendant's suppressed statements is admissible under the inevitable discovery exception to the exclusionary rule.

CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA; and JUDGE CUFF (temporarily assigned) join in JUSTICE SOLOMON's opinion.

33

SUPREME COURT OF NEW JERSEY

NO. ___A-96___                          SEPTEMBER TERM 2013

ON CERTIFICATION TO ____Appellate Division, Superior Court____


STATE OF NEW JERSEY,

      Plaintiff-Respondent,

           v.

MICHAEL A. MALTESE,

      Defendant-Appellant.


DECIDED _____August 17, 2015_____
          Chief Justice Rabner                    PRESIDING
OPINION BY ____Justice Solomon____
CONCURRING/DISSENTING OPINIONS BY _____
DISSENTING OPINION BY _____

| CHECKLIST | AFFIRM IN PART/ REVERSE IN PART/REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |