NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1510-14T4

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

EMIL B. FENNELL,

 Defendant-Appellant.
___________________________________

 Submitted September 13, 2016 – Decided March 9, 2017

 Before Judges Ostrer and Vernoia.

 On appeal from the Superior Court of New
 Jersey, Law Division, Mercer County,
 Accusation No. 14-08-0381.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Amira R. Scurato, Assistant
 Deputy Public Defender, of counsel and on the
 brief).

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Garima Joshi, Deputy
 Attorney General, of counsel and on the
 brief).

PER CURIAM
 Defendant Emil B. Fennell contends the trial court should

have granted his Miranda1 motion to suppress two custodial

statements he made to Trenton police. After the court denied his

motion, defendant pleaded guilty to first-degree aggravated

manslaughter, N.J.S.A. 2C:11-4a(1), of Shawn Marinnie. The State

dismissed the indicted charges of first-degree murder, N.J.S.A.

2C:11-3(a)(2), and related weapons offenses, and the court

sentenced defendant, consistent with the plea agreement, to a

twenty-year term, subject to the No Early Release Act, N.J.S.A.

2C:43-7.2. Defendant also challenges his sentence as excessive.

We affirm.

 I.

 On December 15, 2011, Marinnie was shot in the head while

standing on the 800 block of Stuyvesant Avenue in Trenton. Based

on the subsequent investigation, police charged defendant with the

crime and took him into custody on June 11, 2012. Mercer County

Prosecutor's Office Detective Gary Wasko, and Trenton Police

Detective Brian Egan and Sergeant Christopher Doyle interviewed

defendant the day of his arrest and the next day.

 Egan began the first interview by giving defendant the

complaint. Egan told defendant that his bail was $800,000, and

1
 Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d
694 (1966).
 2 A-1510-14T4
began to read the Miranda rights form, asking defendant to read

back each paragraph after Egan recited it. When Egan reached the

paragraph about the right to counsel, defendant invoked his right

in the following exchange2:

 DETECTIVE EGAN: Okay. You can sign
 here. Now, Emil, the second part of this form
 is called the Waiver of Rights, and the same
 thing, I'll read it to you and then you can
 read it.

 I have read the statement of my rights
 and I understand what my rights are. I'm
 willing to make a statement and answer
 questions. I do not want a lawyer at this
 time. I understand and know what I am doing.
 No promises or threats have been made to me
 and no pressure or coercion of any kind has
 been used against me. That one word,
 coercion, means that we're not forcing you []
 to do anything. We're not trying to trick you
 into talking to us. Could you read this
 paragraph aloud?

 MR. FENNELL: I've read this statement
 of my rights and I understand what my rights
 are. I am willing to make a statement and
 answer questions. I do not want a lawyer at
 this time, which I kind of do.

 [(Emphasis added).]

2
 There are discrepancies in the transcript of the June 11, 2012
interrogation. The record contains a transcript prepared for the
prosecution by a court reporter, prior to the October 3, 2013
motion hearing. There is also a transcript prepared by a court
reporter during the hearing, when the interrogation video was
played. Except as noted, we follow the transcript as prepared
during the hearing.

 3 A-1510-14T4
 Egan then confirmed that defendant was invoking his right to

counsel, and terminated the interrogation:

 DETECTIVE EGAN: Do you -- you mentioned
 that you kind of want an attorney. Do you
 want to speak to an attorney first?

 MR. FENNELL: Yeah.

 DETECTIVE EGAN: Okay.

 MR. FENNELL: You already said that I got
 (indiscernible) --

 DETECTIVE EGAN: All right. That's no
 problem at all. What we'll do is, we'll
 terminate this interview here. I'll take your
 personal property, whatever you have, and put
 you in a cell and you can go from there. Okay.

 Defendant responded by questioning the detectives about what

would happen to him next.

 MR. FENNELL: So how long --

 DETECTIVE EGAN: I can't answer any
 questions, Emil.

 MR. FENNELL: Okay.

 DETECTIVE EGAN: No. How long what?

 MR. FENNELL: Would I be just waiting
 around?

 DETECTIVE EGAN: Well you're going to be
 put in a cell and, you know, whatever.

 DETECTIVE WASKO: (Indiscernible).

 MR. FENNELL: Until I make bail or not?

 DETECTIVE WASKO: Yeah. I mean if you
 post bail today, you got $800,000 –
 4 A-1510-14T4
 Defendant then inquired about whether he could sign the

Miranda form and waive his right to counsel and to remain silent.

 MR. FENNELL: (Indiscernible).

 If I would sign that and talk to you all
 about (indiscernible) that stuff anyway.

 DETECTIVE WASKO: Well then we would have
 had an interview and --

 MR. FENNELL: All right, well, if the
 government is going to interview me I want to
 know what's going on like, I'm lost right now.
 And if I sign I will not be able to still talk
 to a lawyer or I won't be able to stop then?
 Because the first one I signed said I can
 (indiscernible), and then stop certain
 questions, but the second one --

 DETECTIVE WASKO: Here's what it boils
 down to, Emil. I mean, you've been charged
 with murder.

 MR. FENNELL: Yeah, but I --

 DETECTIVE WASKO: Hold on. You've been
 charged with murder, okay.

 MR. FENNELL: Okay.

 DETECTIVE WASKO: And you decided that
 you want an attorney before you talk to us
 about the murder charge, you know, so
 basically that's where we stand right now. So
 the complaints are already there. It's -- the
 Superior Court already signed it.

 MR. FENNELL: All right. Well let's --
 I'll talk to you all then, because I really
 want to know what's going on. Let me sign
 that, that second one.

 5 A-1510-14T4
 DETECTIVE WASKO: You don't want to talk
 to an attorney first?

 MR. FENNELL: There's no need to. I
 didn't do anything. I'm not hiding anything,
 anything, so I can talk to you all right?

 Detective Wasko then left the room for about ten minutes. In

the meantime, Egan talked to defendant about what he studied at

school and his tattoos. When Wasko returned, they re-administered

the Miranda warnings and confirmed that defendant wanted to waive

his rights.

 UNIDENTIFIED SPEAKER: Emil, is it true
 that when we went over the forms the first
 time and you requested a lawyer and then after
 going over those forms the first time you then
 changed your mind and told us you did not want
 a lawyer, is that true?

 MR. FENNELL: Yeah.

 UNIDENTIFIED SPEAKER: Okay. So it's
 true that you wanted to speak to us about this
 and that's why we just redid the forms?

 MR. FENNELL: Yeah.

 UNIDENTIFIED SPEAKER: That was your
 decision.

 MR. FENNELL: My decision.

 UNIDENTIFIED SPEAKER: Okay, sir.

 DETECTIVE EGAN: So, do you still want
 to talk to us about what you're under arrest
 for without a lawyer, right now?

 MR. FENNELL: Go over the charges again.

 6 A-1510-14T4
 DETECTIVE EGAN: Without a lawyer, right
 now?

 MR. FENNELL: Okay.

 In the questioning that followed, defendant claimed he was

home the day of the homicide, but became aware of it. He stated

he knew of the victim, but denied interacting with him. Egan left

the room, and Wasko answered defendant's questions about bail, his

first appearance in court, and the appointment of counsel.

 Then followed an exchange that defendant asserts amounted to

an invocation of the right to remain silent:

 DETECTIVE WASKO: So they'll come talk
 to you at the Workhouse, and we'll go from
 there. That's what's going to happen.

 MR. FENNELL: That's crazy. I'm being
 charged with murder and I didn't do it. I
 hope you all have got enough evidence to
 charge me with this, though.

 DETECTIVE WASKO: Well, obviously we do,
 because we already have the complaint signed.
 You already got your paper.

 MR. FENNELL: All right.

 DETECTIVE WASKO: I mean, is there -- is
 there -- would you like to talk about it some
 more, or are you done talking, or would you
 like to explain to us your whereabouts[3], or
 --

3
 When reviewing the interrogation video, we clearly discern that
Wasko asked defendant if he wanted to "explain your whereabouts,"
although the transcript recorded it as "indiscernible."

 7 A-1510-14T4
 MR. FENNELL: There's nothing else to,
 well, there's nothing else to talk about
 because[4] I didn't do anything, so -- you know,
 I just want one favor. Can I, like, since I'm
 being -- since I'm . . . here[,] can I [ ] go
 in[to] that phone and get my mother-in-law's
 number?

 DETECTIVE WASKO: Yeah. We'll be able
 to do that. We'll be able to do that for you.

 MR. FENNELL: All right. Can you all do
 me one more favor?

 DETECTIVE WASKO: What's that?

 MR. FENNELL: A Black and Mild [cigar].

 DETECTIVE WASKO: They might be able to
 do that for you. I don't know if we have any.
 We'll have to look.

 [(Emphasis added).]

 Egan returned to the interrogation room, and Wasko summarized

what he had told defendant regarding counsel, discovery,

defendant's request to access his phone, and his request for a

Black and Mild. Wasko then asked defendant if his summary was

accurate, and defendant said it was, without claiming that he had

invoked his right to silence.

 Defendant received the cigar he requested and the officers

continued to question him. He described Marinnie's own criminal

4
 This statement did not appear in either transcript of the June
11, 2012 interrogation; however, at the motion to suppress, both
parties stipulated that defendant stated, "There's nothing else
to, well, there's nothing else to talk about because I didn't do
anything."
 8 A-1510-14T4
activity and claimed Marinnie had killed and robbed multiple

victims. Defendant then admitted that Marinnie had robbed him at

gunpoint, after which he heard that Marinnie was going to rob him

again and kill him. Defendant explained he killed Marinnie to

prevent him from doing so.

 The next day, a Trenton police sergeant contacted Egan to

inform him that defendant wanted to speak to him again. Egan

administered a new set of Miranda warnings, and obtained

defendant's signed waiver of his rights. Defendant then confirmed

that after he returned from court, he had asked a guard to convey

his request to speak to Egan. Egan asked, "[W]hat is it that you

want to tell us?" Defendant answered, "Yesterday I withheld just

a little bit from you all." Defendant referred to a man known as

"Loco Pete." In the first interview, defendant said he had heard

of "Loco Pete," and he "probably chilled around him, but [he]

wasn't my boy or nothing like that." However, in the second

interview, defendant disclosed that Loco Pete gave him the gun

used to kill Marinnie, and directed him where to leave the gun

when he was done using it, so Loco Pete could retrieve it.

Defendant admitted that he lied to the officers the previous day

about how he obtained the gun.

 Judge Thomas W. Sumners, Jr., denied defendant's motion in a

thorough fifteen-page opinion. He concluded that after defendant

 9 A-1510-14T4
initially invoked his right to an attorney, he chose to waive that

right. Judge Sumners rejected defendant's argument that the police

failed to honor his initial assertion of rights. The officers had

concluded interrogation, and then engaged in a non-interrogative

exchange that defendant initiated about what would happen next.

The court rejected defendant's argument that the officers' answers

regarding bail and incarceration were coercive. The court noted

that defendant then expressed a desire to waive his rights, after

which the officers readministered Miranda warnings and affirmed

that defendant wished to answer questions.

 The court also rejected defendant's argument that the police

refused to honor defendant's assertion of his right to remain

silent when he stated, "there's nothing else to talk about because

I didn't do anything . . . ." The court recognized that, taken

in isolation, the statement could be so interpreted. But, viewed

in context, it amounted to another denial of guilt, and not a

request to stop the interrogation. The court found that "as the

entirety of the videotape makes clear, the request made by

defendant does not indicate finality of his participation in

questioning but rather 'a reflective pause to collect his thoughts,

consider his options, and attempt to keep his emotions in check

as he confronted the enormity of what he had done.'" (quoting

State v. Diaz-Bridges, 208 N.J. 544, 570 (2011).

 10 A-1510-14T4
 As for the June 12 statement, the court rejected defendant's

argument that it should be suppressed based on the "the fruit of

the poisonous tree doctrine" set forth in Wong Sun v. United

States, 371 U.S. 471, 484, 83 S. Ct. 407, 415-16, 9 L. Ed. 2d 441,

453 (1963), since the court found no predicate violation of

defendant's rights.

 II.

 Defendant raises the following points on appeal:

 POINT I

 THE TRIAL JUDGE ERRED IN FAILING TO SUPPRESS
 THE DEFENDANT'S STATEMENTS WHICH WERE OBTAINED
 IN VIOLATION OF HIS RIGHTS. U.S. CONST.
 AMEND. V, VI, XIV; N.J. CONST. ART. 1, PARAS.
 1, 9, 10.

 A. Law Enforcement Failed To Scrupulously
 Honor Defendant's Invocation Of His Right
 To Counsel.

 B. The Waiver Of Rights Was Not Made
 Knowingly Or Voluntarily.

 C. Law Enforcement Failed To Scrupulously
 Honor Defendant's Invocation Of His Right
 To Silence.

 D. The June 12 Statement Must Be Suppressed
 As It was Directly Derived From The
 Tainted June 11 Statement.

 POINT II

 THE DEFENDANT'S MAXIMUM SENTENCE OF TWENTY
 YEARS WAS MANIFESTLY EXCESSIVE AND UNDULY
 PUNITIVE PARTICULARLY AS APPLIED TO THE
 DEFENDANT AT THE TIME HE STOOD BEFORE THE
 COURT.
 11 A-1510-14T4
 III.

 As he did before the trial court, defendant contends that

during the June 11 interrogation, the officers violated his rights

by questioning him after he invoked his right to counsel and later

after he invoked his right to remain silent. Although he initiated

the June 12 interrogation, he argues it was tainted, because it

derived from the unlawful questioning the day before.

 We must "engage in a 'searching and critical' review of the

record" when reviewing the trial court's denial of a Miranda

motion. State v. Maltese, 222 N.J. 525, 543 (2015) (quoting State

v. Hreha, 217 N.J. 368, 382 (2014)), cert. denied, ___ U.S. ___,

136 S. Ct. 1187, 194 L. Ed. 2d 241 (2016). We defer to the trial

court's fact findings, if supported by sufficient credible

evidence, Hreha, supra, 217 N.J. at 382, but we review legal

questions de novo. State v. Rockford, 213 N.J. 424, 440 (2013).

 With that standard of review in mind, we turn first to the

June 11 interrogation.

 We affirm the trial court's order, substantially for the

reasons set forth in Judge Sumner's cogent opinion. We add the

following comments with respect to defendant's argument that he

sought to terminate the interrogation and invoke his right to

remain silent when he said "there's nothing else to talk about[.]"

 12 A-1510-14T4
 We are mindful that "[o]nce warnings have been given, the

subsequent procedure is clear. If the individual indicates in any

manner, at any time prior to or during questioning, that he [or

she] wishes to remain silent, the interrogation must cease."

Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S. Ct. 1602, 1627,

16 L. Ed. 2d 694, 723 (1966).

 As in this case, a question may arise as to whether a

defendant has actually expressed the desire to remain silent. "[A]

request to terminate an interrogation must be honored 'however

ambiguous.'" State v. Bey, 112 N.J. 45, 64-65 (1988) (quoting

State v. Kennedy, 97 N.J. 278, 288 (1984)). If a defendant's

request is unclear, an officer may ask the defendant to clarify

his or her meaning. State v. Alston, 204 N.J. 614, 623 (2011).

A defendant is not required to speak with "the utmost legal

precision." Bey, supra, 112 N.J. at 65. Nor do we expect officers

to do so, since they often "converse in vernacular or use

colloquial expressions[.]" Alston, supra, 204 N.J. at 627. We

also recognize that "a minute parsing of the words used might

yield an inaccurate picture of what was meant." Ibid. Therefore,

a court must use "a totality of the circumstances approach that

focuses on the reasonable interpretation of [a] defendant's words

and behaviors." Diaz-Bridges, supra, 208 N.J. at 564.

 13 A-1510-14T4
 Our analysis begins with Wasko's unfinished question, "is

there -- would you like to talk about it some more, or are you

done talking, or would you like to explain to us your whereabouts,

or -- [.]" Fairly interpreted, Wasko was not asking defendant

whether he wanted suddenly to invoke his right to remain silent.

Rather, he was asking whether defendant had anything to add to

what he had already said, particularly with regard to where he was

at the time of the fatal shooting. Defendant's response — "there's

nothing else to talk about because I didn't do anything" — was

simply another way of saying that he had no further details to

offer, and he was innocent.

 Defendant's statement was unlike that of the defendant in

Christopher v. Florida, 824 F.2d 836, 840 (11th Cir. 1987), cert.

denied, 484 U.S. 1077, 108 S. Ct. 1057, 98 L. Ed. 2d 1019 (1988),

who invoked his right to remain silent when he affirmatively and

repeatedly stated, "I got nothing else to say[,]" and also demanded

that he be taken into custody. (Emphasis omitted). Nor did

defendant say at the outset of either interrogation, "I don't want

to talk about it," as the defendant did in State v. Bishop, 621

P.2d 1196, 1198 (Or. Ct. App. 1980). See also State v. Johnson,

120 N.J. 263, 281 (1990) (discussing Christopher and Bishop).

Here, defendant did not demand that he be taken to a cell, like

the defendant in Christopher. Nor did he say he was unwilling to

 14 A-1510-14T4
talk, using the first person "I," as the defendants did in

Christopher and Bishop. Instead, he commented on whether further

discussion would be productive. See State v. Williams, 3d Dist.

Allen No. 1-96-24, 1996 Ohio App. LEXIS 5297, at *10-12 (Nov. 12,

1996) (holding that the defendant did not invoke his right to

remain silent when he said, "I don't know what else to say. You

guys assume I did it."); cf. United States v. Adams, 820 F.3d 317,

322-24 (8th Cir. 2016) (defendant's statement — "Nah, I don't want

to talk, man. I mean, I" — followed immediately by further

conversation with officer did not ambiguously invoke his right to

remain silent). In sum, we discern no error in the trial court's

determination that defendant did not invoke his right to remain

silent.

 As there was no violation of defendant's rights during the

June 11 interrogation, defendant's contention that the June 12

interrogation was "fruit of the poisonous tree" must fail. In all

other respects, defendant's rights were honored during the second

interrogation, which defendant initiated.

 Finally, we discern no merit in defendant's challenge to his

sentence. The court's findings of fact regarding aggravating and

mitigating factors were supported by evidence in the record; the

court correctly applied the sentencing guidelines; and the court

did not abuse its discretion in imposing its sentence. See State

 15 A-1510-14T4
v. Cassady, 198 N.J. 165, 180-81 (2009); State v. Roth, 95 N.J.

334, 364-66 (1984).

 Affirmed.

 16 A-1510-14T4