**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4098-16T3

STATE OF NEW JERSEY
IN THE INTEREST OF A.A.,

     Juvenile-Appellant.

 

| APPROVED FOR PUBLICATION |
| :---: |
| **July 31, 2018** |
| **APPELLATE DIVISION** |

Submitted April 11, 2018 — Decided July 31, 2018

Before Judges Fuentes, Koblitz and Manahan.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, FJ-09-118-17.

Joseph E. Krakora, Public Defender, attorney for appellant A.A. (Alyssa Aiello, Assistant Deputy Public Defender, of counsel and on the briefs).

Esther Suarez, Hudson County Prosecutor, attorney for respondent State of New Jersey (Luisa M. Florez, Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

MANAHAN, J.A.D.

This case presents a novel issue in the context of self-incrimination.  The issue is whether it is incongruous to require the presence of a parent prior to a waiver of Miranda[1]

___

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

rights to safeguard a juvenile's right against self-incrimination, yet allow police eavesdropping on the parent-child communication that proves antithetical to that right.

A.A.[2] appeals from an adjudication of delinquency for conduct which, if committed by an adult, would constitute a crime. A.A. was originally charged with attempted murder, N.J.S.A. 2C:11-3 and 2C:5-1; possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); unlawful possession of a firearm, N.J.S.A. 2C:39-5(b); and possession of a firearm by minors, N.J.S.A. 2C:58-6.1. Following a hearing, A.A. was adjudicated delinquent on two counts of second-degree aggravated assault as lesser-included offenses of attempted murder, possession of a weapon for an unlawful purpose, unlawful possession of weapons, and possession of firearms by minors. The disposition was to a two-year custodial term at the New Jersey Training School for Boys.

We derive the following facts from the hearing record. At approximately 9:15 p.m. on July 7, 2016, two individuals suffered non-life-threatening gunshot wounds to the leg as the result of a street shooting which took place on Wilkinson Avenue in Jersey City. On that date and time, Jersey City Police

---

[2] We use initials to protect the identity of the juvenile and minors involved in these proceedings. R. 1:38-3(d).

Officer Joseph Labarbera was on duty with another officer. While operating an unmarked vehicle, Labarbera observed three African American males on bicycles traveling northbound on Bergen Avenue. Labarbera lost sight of the cyclists after they made a right turn onto Wilkinson Avenue. Seconds later, Labarbera heard gun shots. Labarbera reported the incident over his police radio. The report included his observation of the three African American males on bicycles turning down Wilkinson Avenue just prior to the shooting.

Detective Teddy Roque of the Hudson County Prosecutor's Office responded to the report of gunshots fired. While en route to the scene, Roque passed two African American males riding tandem on a bicycle. After Roque heard the report regarding African American males on bicycles involved in the shooting, he drove to the area of Garfield Avenue where he again observed the two males and conducted a stop.

Labarbera responded to the location of the stop. When Labarbera arrived, he recognized one of the individuals as A.A., a juvenile whom he had arrested on prior occasions for curfew violations. Labarbera also identified A.A. and the other juvenile as two of the three cyclists he observed in the Wilkinson Avenue location just prior to the shooting.

After they were detained, police conducted a search of both A.A. and the other juvenile and the area where Roque first observed the juveniles. Neither search resulted in anything of evidentiary value. A more extensive search was conducted by officers with K-9 units, which recovered shell casings and a projectile in the area where the shooting occurred.[3] A.A. was taken into custody, transported to the juvenile detention center and placed in a holding cell.

On October 27, 2016, the court held a N.J.R.E. 104(c) hearing on the State's motion to admit statements made by A.A. to his mother while being held at the juvenile detention center. During the hearing, Jersey City Detective Joseph Chidichimo testified that he contacted A.A.'s mother relative to his detention. Upon the mother's arrival at what Chidichimo described as "the Jersey City Police Department, juvenile building," Chidichimo advised her about the incident and A.A's alleged involvement. According to Chidichimo, the mother became very emotional and asked to speak with A.A. Chidichimo permitted A.A. to speak to his mother from a room opposite the

---

[3] A third suspect was eventually stopped by the police. Nothing of evidentiary value was found on that individual.

holding cell.[4]  Chidichimo stated he was located approximately ten-to-twelve feet away from the holding cell and overheard A.A.'s mother ask him if he was on Wilkinson Avenue.  A.A. responded, "Yes, I was on Wilkinson."  Chidichimo then overheard A.A.'s mother ask him, "Why?" to which he responded, "Because they jumped us last week."  Chidichimo acknowledged that, although trained to read <u>Miranda</u> warnings prior to questioning a suspect, he did not read A.A. his warnings as he originally intended prior to overhearing the statement.[5]

At the conclusion of the hearing, the judge held that A.A.'s statement was admissible.  The judge reasoned that the statement was not the result of police interrogation and, therefore, <u>Miranda</u> was not implicated.

The trial commenced immediately following the decision on the motion and took place over three days.  The State's proofs included the testimony of Labarbera and Rogue, the statement of A.A. and a surveillance video of the scene.  The video depicted three individuals riding bicycles in a single file formation. The third cyclist pulled what appeared to be a gun from his

---

[4]  Chidichimo testified that "there are two holding cells inside the main room of the juvenile building."

[5]  A.A.'s mother testified at the hearing.  She stated that she did not recall A.A. saying that he was on Wilkinson Avenue or that he was "jumped" the previous week.

waist area with his left hand which was followed by flashes of light.[6] At trial, Labarbera and Rogue provided their version of the events consistent with their N.J.R.E. 104 hearing testimony.

At the conclusion of the trial, the judge stated that "the video is one of the strongest items in evidence that satis[fies] me that those three individuals that were riding together . . . act[ed] in concert." The judge added that after careful review of the video he "saw [] a coordinated movement[] that [was] almost like a formation for a plan . . . of attack." The judge further held that just before the shots were fired, the cyclists "accelerate, they put their head down and they keep . . . the same formation. One behind the other in this symmetry, [w]hich indicated to me that this was planned precisely to be able to carry out what happened." Further, the judge stated that because the cyclists acted in concert, they acted as "accomplices" to one another. The judge determined that A.A. was one of the three cyclists based upon Labarbera's identification, and that the statements made by A.A. to his mother established a motive for the shooting. Based upon these findings, the judge adjudicated A.A. delinquent.

On appeal, A.A. raises the following points:

---

[6] We note parenthetically that A.A.'s mother testified that A.A. is right-handed.

POINT I

A.A.'S ADJUDICATIONS OF DELINQUENCY FOR COMMITTING AGGRAVATED ASSAULT CANNOT STAND BECAUSE THE STATE'S FAILURE TO PROVE THE IDENTITY OF THE ALLEGED VICTIMS REQUIRED ENTRY OF A JUDGMENT OF ACQUITTAL ON BOTH COUNTS OF ATTEMPTED MURDER. (Not Raised Below)

POINT II

THE TRIAL COURT ERRED IN FAILING TO GRANT A.A.'S MOTION FOR JUDGMENT OF ACQUITTAL AS TO ALL COUNTS BECAUSE THE EVIDENCE FAILED TO ESTABLISH A.A.'S [CULPABILITY] AS EITHER A PRINCIPAL OR ACCOMPLICE. ALTERNATIVELY, A.A.'S ADJUDICATIONS OF DELINQUENCY CANNOT STAND BECAUSE THE TRIAL COURT'S VERDICT OF GUILT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

POINT III

THE TRIAL COURT ERRED IN ALLOWING THE STATE TO INTRODUCE A.A.'S UNWARNED STATEMENTS TO HIS MOTHER[] BECAUSE THEY WERE OBTAINED BY POLICE IN VIOLATION OF A.A.'S FIFTH AMENDMENT RIGHTS.

We confine our decision to the argument raised by A.A. relative to the admission of his statement.[7]

I.

The Fifth Amendment of the United States Constitution guarantees all persons with the privilege against self-incrimination, and applies to the states through the Fourteenth

---

[7] A.A. also raised arguments in his reply brief which we do not need to address. See State v. Lenihan, 219 N.J. 251, 265 (2014).

Amendment. U.S. Const. amend. V, XIV; Griffin v. California, 380 U.S. 609, 615 (1965). This privilege against self-incrimination "is one of the most important protections of the criminal law." State v. Presha, 163 N.J. 304, 312 (2000). In New Jersey, there is a common law privilege against self-incrimination, which has been codified in statutes and rules of evidence. N.J.S.A. 2A:84A-19; N.J.R.E. 503; State v. Reed, 133 N.J. 237, 250 (1993). "New Jersey's privilege against self-incrimination is so venerated and deeply rooted in this state's common law that it has been deemed unnecessary to include the privilege in our State Constitution." State v. O'Neill, 193 N.J. 148, 176 (2007). Significantly, our Supreme Court "has treated 'our state privilege as though it were of constitutional magnitude, finding that it offers broader protection than its Fifth Amendment counterpart.'" State v. Wright, 444 N.J. Super. 347, 363 (App. Div. 2016) (quoting O'Neill, 193 N.J. at 176-77).

A confession or an incriminating statement obtained during a custodial interrogation may not be admitted in evidence unless a defendant has been advised of his or her constitutional rights. Miranda, 384 U.S. at 492. As custodial interrogations without Miranda warnings create a presumption of compulsion, unwarned statements must be suppressed even when they are otherwise voluntary within the meaning of the Fifth Amendment.

See State v. Hubbard, 222 N.J. 249, 265-66 (2015) (citations omitted). A defendant may waive his or her privilege against self-incrimination; however, that defendant's waiver must be voluntary, knowing, and intelligent. State v. Hreha, 217 N.J. 368, 382 (2014). The State bears the burden of proving beyond a reasonable doubt that a defendant's confession is not resultant from actions by law enforcement officers that overbore defendant's will. Id. at 383. The State bears a similar burden when a defendant challenges a statement procured by police action without the benefit of Miranda warnings. See State v. Clausell, 121 N.J. 298, 352-53 (1990).

II.

Juvenile defendants, like adults, possess the right to be free from self-incrimination. See N.J.S.A. 2A:4A-40; see also In re Gault, 387 U.S. 1, 13 (1967) ("[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone."). Juveniles are entitled to Miranda warnings before any statement is taken in a custodial setting regardless of whether the delinquency proceedings have begun. Presha, 163 N.J. at 312-13. The standard used when determining the validity of Miranda waivers by adults, the totality of the circumstances, applies to juveniles. State ex rel. A.S., 203 N.J. 131, 146 (2010). As a

practical matter, juvenile waivers receive heightened scrutiny because of their age, experience and level of education.

Presha has been referenced as New Jersey's "seminal case addressing the admissibility of juvenile confessions." A.S., 203 N.J. at 146. In Presha, the Court elaborated on the Miranda procedures that should be followed when the police are conducting a custodial interrogation of a juvenile. 163 N.J. at 312-13. At the forefront of those procedures is the role of a parent, in which the Court found a "special significance." Id. at 314. "[I]n the context of a juvenile interrogation[,] . . . the parent serves as advisor to the juvenile, someone who can offer a measure of support in the unfamiliar setting of the police station." Ibid. (citing Gallegos v. Colorado, 370 U.S. 49, 54 (1962)). Moreover, highlighting the "new significance" of the parent's role due to the increased prosecution of juveniles, the Court saliently provided:

> When younger offenders are in custody, the parent serves as a buffer between the juvenile, who is entitled to certain protections, and the police, whose investigative function brings the officers necessarily in conflict with the juvenile's legal interests. Parents are in a position to assist juveniles in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an interrogation.
>
> [Id. at 315.]

Specifically, the Court held that the police must use their best efforts to locate a juvenile's parent or legal guardian before commencing interrogation, and that the adult's absence should be given added weight when balancing all factors to determine whether a waiver of rights and confession were knowing, intelligent, and voluntary in the totality of the circumstances. Ibid. The Court stressed in Presha that the absence of the adult's presence was a "highly significant factor" in evaluating waiver. Id. at 315. Other factors include "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved" and prior experience with the criminal justice system. Presha, 163 N.J. at 313 (quoting State v. Miller, 76 N.J. 392, 402 (1978)).

### III.

The State's argument on appeal, as it was before the Family Part, is that A.A.'s statement was not the product of "police interrogation" or its functional equivalent. For the reasons that follow, we disagree.

We commence our discussion by noting that although the constitutional protection afforded by our courts against self-incrimination is precise in delineated settings, the lack of

precision in this discrete setting should not compel a nuanced resolution. The facile path is to conclude that there was no police interrogation and thus, no violation of A.A.'s rights. The essential problem in selecting that path is adherence to a precept that ignores constitutional safeguards. Here, while A.A.'s statement was not elicited by express questioning by the police, the statement was the product of the actions of the police.

"The United States Supreme Court has made clear that Miranda warnings are required 'whenever a person in custody is subjected to either express questioning or its functional equivalent.'" Wright, 444 N.J. Super. at 363-64 (citing Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). In Innis, the United States Supreme Court noted that interrogation under Miranda also includes:

> any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The later position of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.
>
> [446 U.S. at 301.]

This court has addressed the "functional equivalent" of interrogation in pre-Miranda warning cases where police conduct

was "reasonably likely to elicit an incriminating response." State v. Ward, 240 N.J. Super. 412, 417 (App. Div. 1990) (quoting Innis, 446 U.S. at 303). In State v. Brown, we cited to Ward and noted that "Miranda safeguards come into play whenever someone is subject either to express questioning 'or its functional equivalent.'" 282 N.J. Super. 538, 549 (App. Div. 1995) (quoting Innis, 446 U.S. at 300-02).

The defendants in Ward and Brown each gave oral statements that were not produced by the direct questions of the police. The statements were made without Miranda warnings and subsequent to the police providing Ward and Brown with proofs obtained during the investigation relating to the crimes for which they were suspects. In both cases, this court excluded the oral statements in that, despite "non-police interrogation," the process employed to obtain the statement failed to scrupulously honor defendants' Miranda rights. Brown, 282 N.J. Super. at 550-51; Ward, 240 N.J. Super. at 419.[8]

We are cognizant of the distinction that can be drawn between the police participation in the interrogation process in Ward and Brown and the police participation here. Chidichimo

---

[8] Although we concluded in Brown that defendant's oral statement was excluded, we concluded that his post-Miranda warnings and waiver rendered his written statement admissible. 282 N.J. Super. at 551.

did not present proofs to A.A. that produced the statements. Rather, he permitted A.A.'s mother to speak to her son while he listened. Nonetheless, in consideration of the rights at issue, we reject that distinction. Any pre-<u>Miranda</u> warning process that employs a parent as surrogate in an interrogation reasonably likely to elicit an incriminatory statement, does not scrupulously honor a juvenile's rights. This is so even if the process employed by the police may not be intended to elicit the statement.

Here, A.A. was subjected to the functional equivalent of police interrogation. Chidichimo should have reasonably known of the propensity for the conversation between A.A. and his mother to produce an incriminating statement. This result was more predictive when A.A.'s mother was informed why he was detained.

Concerning the "interrogation" itself, we consider any distinction between the police as interrogator or A.A.'s mother as interrogator as a distinction without a difference. In responding to his mother's questions in the earshot of Chidichimo, A.A., uninformed of his <u>Miranda</u> rights and uncounseled by his parent, was responding to the police.

Moreover, to conclude that there was no "police interrogation" would be in disregard of both common sense and

the safeguards for juveniles against self-incrimination first recognized in Gault, 387 U.S. at 13.  Since Gault, courts have been mindful of the personal characteristics of an accused, including their youthfulness.  A.S., 203 N.J. at 149; Presha, 163 N.J. at 315-16 (noting "younger offenders present a special circumstance in the context of police interrogation.").  It follows that reviewing courts should be similarly mindful of the inherent pressure upon a child to respond to the questioning of a parent and the corresponding risk of self-incrimination, especially where the child has not been informed of their right to remain silent.

A.S. involved a custodial interrogation of a juvenile in which the police placed the juvenile's mother in the role of their helper during the interrogation process by having the adoptive mother read the child her rights.  203 N.J. at 136. Thereafter, the police failed to correct the mother's misstatements about those rights.  Ibid.  The child ultimately made an incriminating statement used in evidence during the delinquency adjudication.  Id. at 136-37.

Holding the statement was involuntary and thus inadmissible due to the totality of the circumstances, Justice LaVecchia aptly wrote that "[o]ur purpose in establishing in Presha a preference for parental presence for a child facing questioning

by police was to assist the child in the exercise of his or her constitutional rights; <u>it was not to provide the police with an assistant</u>." <u>Id.</u> at 137 (emphasis added).[9]

Thus, since A.A. was in custody and subjected to the functional equivalent of police interrogation, he was entitled to <u>Miranda</u> warnings. The failure to provide the warnings to A.A. prior to obtaining the statements requires suppression.

IV.

In addition to the concerns engendered by utilizing a parent as an assistant in the interrogation, we further note with disfavor the lack of privacy afforded to the parent-child communication. In this vein, we are informed by decisions of other states requiring police to provide a juvenile and a parent an unsolicited opportunity to confer in private. See <u>D.M. v. State</u>, 949 N.E.2d 327 (Ind. 2011); <u>J.L. v. State</u>, 5 N.E.3d 431, 437 (Ind. Ct. App. 2014) ("Consultation can be meaningful only in

---

[9] Courts have held in certain circumstances that parents may serve as surrogates or assistants to an interrogation. However, in those cases <u>Miranda</u> warnings were given in the presence of the parent and the child prior to the statements. See <u>State v. O.N.</u>, 179 N.J. 165, 176-77 (2004) (after the administration of <u>Miranda</u> warnings in the presence of the mother and the juvenile, the mother took an "active role in directing her son to 'answer the officer's questions.'"); <u>see also</u> <u>State v. Belliard</u>, 415 N.J. Super. 51, 80-81 (2010) (after the administration of <u>Miranda</u> warnings in the presence of the mother and the juvenile, the mother "unequivocally supported the police officer's questioning of her son.").

the absence of police pressure. . . . Privacy is essential to a meaningful consultation."); Commonwealth v. Roe, 329 A.2d 286, 289 (Pa. 1974) (suppressing an incriminating statement by a juvenile as not knowing or intelligent because the juvenile's mother was not permitted to speak to him privately and advise him of his constitutional rights); In re E.T.C., 449 A.2d 937, 940 (Vt. 1982) (suppressing a statement by a juvenile as "[t]here was no meaningful consultation by the [interested adult] with the juvenile as [a meaningful consultation] could only occur in the absence of police pressures."). Notably, Indiana has codified a juvenile's right to a "meaningful consultation" with a parent before their constitutional rights may be waived. See Ind. Code § 31-32-5-1(2)(C).

The rationale for private communication referenced in other state's decisions is equally applicable in scenarios such as that presented in this matter. Suffice it to state that were there a similar requirement of a meaningful private conversation with a parent, there may have been no statements available for use by the State. Furthermore, the ability of a parent to engage in a private communication with a juvenile serves the purpose of the

parent's presence, i.e., to provide the advice and guidance envisioned by Presha.[10]

V.

Having determined that it was erroneous to allow the State to use A.A.'s statements, we next turn to whether the error requires a new hearing. On that score, the judge's consideration of and reliance upon A.A.'s statements as proof of motive demonstrates the statements' significant role in the hearing's outcome. As such, the error was "clearly capable of producing an unjust result[.]" R. 2:10-2; State v. Ross, 218 N.J. 130, 143 (2014). Therefore, we reverse the adjudication of delinquency and remand the matter for a new hearing.

In closing, we add that a contrary holding to the one reached today would be in derogation of the safeguards afforded under the Fifth Amendment and the broader protection afforded under our state law privilege. O'Neill, 193 N.J. at 176-77. In sum, we are satisfied that the process by which incriminating statements were secured from A.A. presented an unconstitutional intrusion upon those afforded safeguards. We are further

---

[10] Notwithstanding our reference to other jurisdictions that have addressed the issue of private communications, we do not suggest or comment on the wisdom of an amendment to the Juvenile Code. We leave that determination to the Legislature. Rather, in reaching our decision, we have again confirmed a juvenile's right against self-incrimination and highlighted the critical role of a parent in the protection of that right.

satisfied that the excuse of that process as "non-police interrogation" would promote an impermissible practice.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION