SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State of New Jersey in the Interest of A.A.** (A-50-18) (081793)

**Argued October 23, 2019 -- Decided January 15, 2020**

**RABNER, C.J., writing for the Court.**

In State v. Presha, 163 N.J. 304, 316 (2000), the Court directed law enforcement officers to "use their best efforts to locate a parent or legal guardian" before starting to interrogate a juvenile in custody. In an otherwise intimidating setting, parents can help juveniles understand they have the right not to incriminate themselves and the right to have an attorney present -- and can help juveniles decide whether to waive their rights. Parents essentially serve "as a buffer" between juveniles and the police. Id. at 315.

In this appeal, the Court considers whether incriminating statements a fifteen-year-old made to his mother at a police station can be used against him.

On July 7, 2016, Officer Joseph Labarbera saw three black males on bicycles head east on Wilkinson Avenue in Jersey City. About fifteen seconds later, he and his partner heard eight to ten gunshots from the east. They transmitted over the radio what they had heard along with a description of the three men on bicycles. Soon after, two victims were found in front of 135 Wilkinson Avenue, in the direction the cyclists were seen riding.

A.A. was stopped nearby and, based on Labarbera's identification, was taken into custody, brought to a juvenile facility, and placed in a holding cell. In accordance with Presha, the police contacted his mother, who was taken to an interview room where Detective Joseph Chidichimo and another officer told her why A.A. was under arrest. A.A.'s mother was visibly emotional and asked to speak with her son; the officers took her to where A.A. was detained. The police allowed A.A. and his mother to speak through the gate of the holding cell. Five officers were in the room within ten to fifteen feet of A.A.

Chidichimo testified at a pretrial hearing that he overheard the conversation between A.A. and his mother. According to the detective, A.A.'s mother asked if he had been on Wilkinson Avenue, and he confirmed that he had. When she asked why, A.A. responded, "because they jumped us last week." At that point, A.A.'s mother began to cry and left the room.

1

A.A.'s mother testified at the hearing. She explained that the police told her A.A. had "shot somebody" and that she asked to speak with her son. She said she was crying and spoke in a loud voice, and that she and her son could see multiple officers in the room at the time. She testified that A.A. denied "do[ing] that" and said nothing about "being jumped."

A.A. was charged with two counts of attempted murder as well as weapons offenses. At the delinquency hearing, the State introduced A.A.'s statements to his mother, which the Family Part judge had found admissible; testimony from Labarbera, Chidichimo, and another officer; photos and physical evidence from the shooting; and video surveillance. The video was not clear enough to identify any of the cyclists. And none of the physical evidence directly connected A.A. to the shooting.

The judge adjudicated A.A. delinquent on two counts of aggravated assault and all weapons charges, relying heavily on Officer Labarbera's testimony that he observed A.A. riding a bicycle on Wilkinson Avenue just before the shooting; the surveillance video; and Detective Chidichimo's account of A.A.'s statement to his mother. The Appellate Division reversed and remanded for a new hearing. 455 N.J. Super. 492, 506-07 (App. Div. 2018). The Court granted certification. 236 N.J. 602 (2019).

**HELD:** The actions of the police amounted to the functional equivalent of interrogation. As a result, A.A. should have been advised of his Miranda rights in the presence of his mother. To hold otherwise would turn Presha and the safeguards it envisioned on their head. To address the special concerns presented when a juvenile is brought into custody, police officers should advise juveniles of their Miranda rights in the presence of a parent or guardian before the police question, or a parent speaks with, the juvenile. Officers should then let the parent and child consult in private. That approach would afford parents a meaningful opportunity to help juveniles understand their rights and decide whether to waive them. Because A.A.'s inadmissible statements comprised a substantial part of the proofs against him, a new hearing is necessary.

1. Federal and state law provide protections against self-incrimination. Suspects can waive their rights and make incriminating statements to law enforcement. To be admissible at trial, the State must demonstrate beyond a reasonable doubt that a suspect's waiver was knowing, intelligent, and voluntary. Courts look to the totality of the circumstances to assess the voluntariness of a statement. (pp. 11-12)

2. In Rhode Island v. Innis, officers arrested the defendant for robbery with a sawed-off shotgun. 446 U.S. 291, 293-94 (1980). Innis received three sets of Miranda warnings but declined to waive his rights. Id. at 294. While Innis was being transported to the central police station, two officers discussed the risk that students who attended a nearby school for "handicapped children" "might find a weapon" and "hurt themselves." Id. at 294-95. Innis interrupted the conversation and told the officers to "turn the car around so he could

2

show them where the gun was located." Id. at 295. The United States Supreme Court held that Miranda's safeguards applied not only to express interrogation of a suspect in custody but also to "its functional equivalent." Id. at 300-01. (pp. 12-15)

3. The New Jersey Supreme Court has interpreted N.J.S.A. 2A:84A-19 and N.J.R.E. 503 to grant broader protection than the federal privilege against self-incrimination. The Court has adopted the Innis standard and embraced the view that interrogation includes not only direct questioning but also any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response. (pp. 15-16)

4. Juveniles receive heightened protections when it comes to custodial interrogations for obvious reasons. Without guidance from an adult relative, friend, or lawyer, juveniles are on an unequal footing with their interrogators and are not able to know, let alone assert, their constitutional rights. In State in Interest of S.H., the Court "emphasize[d that] whenever possible and especially in the case of young children no child should be interviewed except in the presence of his parents or guardian." 61 N.J. 108, 114-15 (1972). (pp. 16-17)

5. The Court built on S.H. in Presha, 163 N.J. at 314. Noting that "[p]arents are in a position to assist juveniles in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an interrogation," id. at 315, the Court imposed a bright-line rule for juveniles under the age of fourteen that statements made "when a parent or legal guardian is absent from" the interrogation are not admissible "unless the adult was unwilling to be present or truly unavailable," ibid. For all juveniles, the Court instructed that "police officers must use their best efforts to locate a parent or legal guardian before" an interrogation begins. Id. at 316. (pp. 18-19)

6. The Court's recent ruling in State in Interest of A.S., 203 N.J. 131 (2010), underscored the supportive role parents have in the context of a custodial interrogation. In A.S., the police enlisted the mother of a fourteen-year-old girl, A.S., to help during the interrogation process. They asked the mother to recite the Miranda warnings and did not correct her misstatements. Id. at 136. A.S.'s mother repeatedly badgered her into answering the officer's questions. The Court concluded that A.S.'s confession was involuntary and confirmed that a parent's "presence alone" is not what Presha contemplated. Id. at 148, 152. To serve as a buffer between the police and the juvenile, a parent must act "with the interests of the juvenile in mind." Id. at 148. The Court affirmed that the purpose of Presha -- to have a parent present during interrogation -- "was to assist the child in the exercise of his or her constitutional rights; it was not to provide the police with an assistant." Id. at 137. (pp. 19-20)

7. Here, the police contacted A.A.'s mother and summoned her to the police station. The reason to summon A.A.'s mother was for her to help her son understand his rights and act intelligently in deciding whether to waive them. See Presha, 163 N.J. at 315. But before

3

mother and son began to speak, the police did not advise A.A. of his rights in his mother's presence. Neither A.A. nor his mother had been made aware that anything A.A. might say could be used against him, among other important rights. A.A. made critical admissions to his mother that the Family Part judge later relied on. He was subjected to the "functional equivalent" of express questioning while in custody, and his statements, obtained without the benefit of Miranda warnings, are thus inadmissible. What took place here upended the Presha model. Instead of serving as a buffer to help a juvenile understand his rights, the child's mother unwittingly assisted the police and helped gather incriminating evidence. The Court bases its ruling on state law. (pp. 20-22)

8. The protections outlined in Presha remain good law. The Court adds the following guidance. The police should advise juveniles in custody of their Miranda rights -- in the presence of a parent or legal guardian -- before the police question, or a parent speaks with, the juvenile. Officers should then give parents or guardians a meaningful opportunity to consult with the juvenile in private about those rights. That approach would enable parents to help children understand their rights and decide whether to waive them -- as contemplated in Presha. If law enforcement officers do not allow a parent and juvenile to consult in private, absent a compelling reason, that fact should weigh heavily in the totality of the circumstances to determine whether the juvenile's waiver and statements were voluntary. See ibid. If legitimate security concerns require the police to observe a private consultation, the police can monitor the interaction without listening to the words spoken between parent and child. (pp. 22-23)

9. The Court agrees with the Appellate Division that a new hearing is required. 455 N.J. Super. at 506. The Family Part judge pointedly relied on A.A.'s statements to establish his whereabouts at the time of the offense as well as his motive. The pivotal admissions were "clearly capable of producing an unjust result." R. 2:10-2. (p. 24)

**The judgment of the Appellate Division is AFFIRMED and the matter is REMANDED for a new hearing.**

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON and TIMPONE join in CHIEF JUSTICE RABNER's opinion.**

SUPREME COURT OF NEW JERSEY

A-50 September Term 2018

081793

State of New Jersey
in the Interest of A.A.,
Juvenile.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
455 N.J. Super. 492 (App. Div. 2018).

Argued                            Decided
October 23, 2019          January 15, 2020

Frank Muroski, Deputy Attorney General, argued the
cause for appellant State of New Jersey (Gurbir S.
Grewal, Attorney General, attorney; Frank Muroski, of
counsel and on the briefs).

Alyssa Aiello, Assistant Deputy Public Defender, argued
the cause for respondent A.A. (Joseph E. Krakora, Public
Defender, attorney; Alyssa Aiello, of counsel and on the
briefs).

William J. Munoz argued the cause for amicus curiae
Association of Criminal Defense Lawyers of New Jersey
(Whipple Azzarello, attorneys; William J. Munoz, on the
brief).

Laura Cohen argued the cause for amicus curiae
American Civil Liberties Union of New Jersey (American
Civil Liberties Union of New Jersey Foundation and
Rutgers Criminal and Youth Justice Clinic, attorneys;
Alexander Shalom and Jeanne LoCicero, of counsel and
on the brief, and Laura Cohen, on the brief).

1

In <u>State v. Presha</u>, 163 N.J. 304, 316 (2000), the Court directed law enforcement officers to "use their best efforts to locate a parent or legal guardian" before starting to interrogate a juvenile in custody. In an otherwise intimidating setting, parents can help juveniles understand they have the right not to incriminate themselves and the right to have an attorney present -- and can help juveniles decide whether to waive their rights. Parents essentially serve "as a buffer" between juveniles and the police. <u>Id.</u> at 315.

In this appeal, we consider whether incriminating statements a fifteen-year-old made to his mother at a police station can be used against him. The police arrested the juvenile, A.A., in connection with a shooting incident, and summoned his mother to the police station in compliance with <u>Presha</u>. They advised her of the charges her son faced and then brought her to see him at her request.

Officers listened to the conversation between mother and son -- which took place on opposite sides of the gate of a holding cell -- and the State later presented the comments at trial. At no point did the police advise A.A. of his rights. Nor did they question him after he made admissions to his mother.

Like the Appellate Division, we find that the actions of the police amounted to the functional equivalent of interrogation. As a result, A.A. should have been advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), in the presence of his mother. To hold otherwise would turn Presha and the safeguards it envisioned on their head.

To address the special concerns presented when a juvenile is brought into custody, police officers should advise juveniles of their Miranda rights in the presence of a parent or guardian before the police question, or a parent speaks with, the juvenile. Officers should then let the parent and child consult in private. That approach would afford parents a meaningful opportunity to help juveniles understand their rights and decide whether to waive them.

Because A.A.'s inadmissible statements comprised a substantial part of the proofs against him, we affirm the judgment of the Appellate Division and remand for a new hearing.

## I.

This case involves a shooting that took place on July 7, 2016, at about 9:15 p.m., in front of a home on Wilkinson Avenue in Jersey City. We draw the following facts from testimony at a pretrial hearing and the delinquency proceeding.

3

Officer Joseph Labarbera of the Jersey City Police Department was on duty at the time and saw three black males on bicycles head east on Wilkinson Avenue. He also noticed how they were dressed. About fifteen seconds later, he and his partner heard eight to ten gunshots fired east of where they were located. As they drove on Wilkinson Avenue toward the gunfire, they transmitted over the radio what they had heard along with a description of the three men on bicycles. Soon after, two victims -- each with a gunshot wound to the leg -- were found in front of 135 Wilkinson Avenue, in the direction the cyclists were seen riding.

Detective Teddy Roque responded to the report of gunfire and drove around the general area. He spotted and later stopped two black males on one bicycle. Labarbera headed to the area and identified both individuals as the same people he had seen minutes earlier. One of them was A.A., who Labarbera also recognized from prior encounters that involved curfew violations.

The police found no weapons, ammunition, or gunpowder residue on the two individuals. Fourteen shell casings and one projectile were recovered at the crime scene.

The police took A.A. into custody, brought him to a juvenile facility, and placed him in a holding cell. No one else was taken into custody. In

4

accordance with Presha, the police contacted A.A.'s mother, who arrived about thirty minutes later along with A.A.'s aunt. Both women were taken to an interview room where Detective Joseph Chidichimo and another officer told them about the incident and why A.A. was under arrest. A.A.'s mother was visibly emotional and asked to speak with her son; the officers then took her to the holding cell on the other side of the building where A.A. was detained. There were two cells in the area -- a space about twenty by thirty feet that also had a fingerprinting station, computers, printers, and two bathrooms.

The police allowed A.A. and his mother to speak through the gate of the holding cell. While they talked, five officers including Chidichimo were in the room within ten to fifteen feet of A.A. Chidichimo explained that he monitored A.A. and his mother as a safety precaution, consistent with police protocol.

Chidichimo testified at a pretrial hearing that he overheard the conversation between A.A. and his mother. According to the detective, A.A.'s mother asked if he had been on Wilkinson Avenue, and he confirmed that he had. When she asked why, A.A. responded, "because they jumped us last week." At that point, A.A.'s mother began to cry and left the room. The detective noted that he could hear the conversation because A.A.'s mother,

who was "visibly upset" and "in an emotional state," raised her voice while she spoke, and A.A. responded in a "normal speaking tone."

The detective testified that he had intended to question A.A. if his mother consented. When she walked out of the room, though, he told her A.A. would be transferred to the juvenile detention facility and she was "free to leave." The police did not attempt to question A.A. or give him <u>Miranda</u> warnings at any point.

A.A.'s mother testified at the hearing. She explained that the police told her A.A. had "shot somebody" and that she asked to speak with her son. She said she was crying and spoke in a loud voice, and that she and her son could see multiple officers in the room at the time. She testified that A.A. denied "do[ing] that" and said nothing about "being jumped."

A.A. was charged with two counts of attempted murder, N.J.S.A. 2C:11-3 and 2C:5-1; possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and possession of a firearm by a minor, N.J.S.A. 2C:58-6.1.

Prior to trial, the State moved to admit A.A.'s statements to his mother. After a hearing under Rule 104(c), at which Detective Chidichimo and A.A.'s mother testified, the Family Part judge concluded the statements were admissible. The court first credited the detective's testimony about what A.A.

6

said to his mother. Next, the court determined that because A.A. was not subjected to a police interrogation or its functional equivalent, he was not entitled to <u>Miranda</u> warnings. The judge also found no evidence that the police exerted any pressure on A.A. or used any "invasive means to listen in on the conversation."

Among other evidence at the delinquency hearing, the State introduced A.A.'s statements; testimony from Labarbera, Roque, and Chidichimo; photos and physical evidence from the shooting, including shell casings, a projectile, and a pair of pants a victim wore; and video surveillance. Two weeks after the incident, the police obtained footage from a surveillance camera near the shooting. It showed three individuals riding bicycles side-by-side and then in a single line. The last cyclist appeared to draw a gun from his waist and fire with his left hand. The video was not clear enough to identify any of the cyclists. And none of the physical evidence directly connected A.A. to the shooting.

A.A.'s mother testified at the delinquency hearing and recounted her version of the conversation at the juvenile facility once again. She also testified that A.A. was right-handed.

The Family Part judge adjudicated A.A. delinquent on two counts of second-degree aggravated assault -- lesser-included offenses of attempted

7

murder -- and all three weapons charges. In an oral statement of reasons, the court relied heavily on three pieces of evidence: Officer Labarbera's testimony that he observed A.A. riding a bicycle on Wilkinson Avenue just before the shooting; the surveillance video, which revealed the three cyclists acted in concert; and Detective Chidichimo's account of A.A.'s statement to his mother. The court specifically found that the statement demonstrated that A.A. "was on Wilkinson Avenue" and disclosed "the reason . . . he was there": "to retaliate for . . . himself and others being jumped last week." The judge sentenced A.A. to two years in custody at a juvenile detention center.

The Appellate Division reversed and remanded for a new hearing. State in Interest of A.A., 455 N.J. Super. 492, 506-07 (App. Div. 2018). The court found that even though the officers did not question A.A. directly, their actions subjected him to the functional equivalent of police interrogation. Id. at 502-04 (citing Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). The Appellate Division observed that a "process that employs a parent as [a] surrogate in" a way that is "reasonably likely to elicit an incriminatory statement, does not scrupulously honor a juvenile's rights." Id. at 503.

Because the police failed to provide Miranda warnings to A.A. under the circumstances, the court concluded his statements should have been suppressed. Id. at 505. In view of the "significant role" the statements played

8

in the outcome, the court ordered a new hearing.  Id. at 506.  The Appellate Division also "note[d] with disfavor the lack of privacy afforded to" parents and children in this setting.  Id. at 505.

We granted the State's petition for certification.  236 N.J. 602 (2019).  We also granted the American Civil Liberties Union of New Jersey (ACLU) and the Association of Criminal Defense Lawyers of New Jersey (ACDL) leave to appear as amici curiae.

## II.

The State, represented by the Attorney General, contends that the Appellate Division mistakenly equated a mother's conversation with her son with a police interrogation.  Because the police inadvertently overheard the conversation while standing nearby in full view, the State argues the Appellate Division's ruling should be reversed.

According to the State, the conversation was not the functional equivalent of an interrogation; it was "more akin to a blurt-out."  A detective monitored the interaction for safety reasons, the State submits, and officers did not exert any pressure on the juvenile or his mother or use any invasive means to overhear the audible conversation.  Under the circumstances, the State maintains the police were not required to give Miranda warnings, and A.A.'s adjudication of delinquency should stand.

9

A.A. argues that his unwarned statements were the product of police interrogation and should not have been admitted as evidence against him. He contends the statements resulted from the functional equivalent of a police interrogation in which his mother unwittingly played a role. He claims he was therefore entitled to receive Miranda warnings even in the absence of coercion or express questioning by the police. A.A. maintains that the totality of the circumstances rendered his statements involuntary.

In A.A.'s view, this appeal also shows the need for the Court to fortify the heightened protections afforded juveniles under Presha. A.A. insists that a parent's presence alone does not satisfy Presha.

The ACLU agrees with A.A. that the police conducted a custodial interrogation by using his mother as an unwitting agent. As a result, the ACLU argues, A.A.'s statements should be suppressed. The ACLU also submits that children require more robust protections than adults during custodial interrogations and that this Court should accordingly strengthen the protections Presha provides. In particular, the ACLU urges the Court to require consultation with counsel before a juvenile may waive the right against self-incrimination.

The ACDL contends that A.A.'s custodial statement was the result of police action and should have been suppressed. Like A.A. and the ACLU, the

10

ACDL submits that the policies underlying <u>Presha</u> call for parents and juveniles to have a meaningful opportunity to consult in private before a juvenile is asked to waive his or her <u>Miranda</u> rights. If it is too burdensome for the police to accommodate a private conversation, the ACDL submits that any statements the police overhear should be presumed inadmissible.

III.

A.

Federal and state law provide protections against self-incrimination. The Fifth Amendment guarantees the well-known privilege: "No person . . . shall be compelled in any criminal case to be a witness against himself." <u>U.S. Const.</u> amend. V; <u>see also</u> <u>Malloy v. Hogan</u>, 378 U.S. 1, 8 (1964) (noting the right against self-incrimination applies to the States through the Fourteenth Amendment).

Although the State Constitution does not refer to the privilege, it is nonetheless "firmly established as part of the common law of New Jersey." <u>State v. Hartley</u>, 103 N.J. 252, 260 (1986) (quoting <u>In re Martin</u>, 90 N.J. 295, 331 (1982)); <u>accord</u> <u>State v. O'Neill</u>, 193 N.J. 148, 175-76 (2007). The privilege has also been codified by statute and incorporated into the Rules of Evidence. N.J.S.A. 2A:84A-19; N.J.R.E. 503.

Suspects can of course waive their rights and make incriminating statements to law enforcement. To be admissible at trial, the State must demonstrate beyond a reasonable doubt that a suspect's waiver was knowing, intelligent, and voluntary. O'Neill, 193 N.J. at 168 n.12. The same standard applies to a confession by a juvenile. State in Interest of A.S., 203 N.J. 131, 146 (2010); Presha, 163 N.J. at 313.

Courts look to the totality of the circumstances to assess the voluntariness of a statement. A.S., 203 N.J. at 148; Presha, 163 N.J. at 313.

> [T]he factors relevant when making that determination include the child's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved, prior experience with the legal system, and the "highly significant factor" of parental involvement.
>
> [A.S., 203 N.J. at 148.]

## B.

To enforce the privilege and dispel the pressures of a custodial setting, the United States Supreme Court established certain procedural safeguards in Miranda, 384 U.S. at 444. Before the police can question a suspect in custody, they must inform the person of the now familiar warnings. Id. at 467-68. The suspect must be told

that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

[Id. at 479.]

The United States Supreme Court held in Rhode Island v. Innis that Miranda warnings are required when a person in custody is subject to either "express questioning" or the "functional equivalent" of interrogation. Innis, 446 U.S. at 300-01. The Court also clarified the meaning of those terms.

In Innis, officers arrested the defendant, Innis, for robbery with a sawed-off shotgun. Id. at 293-94. Innis received three sets of Miranda warnings but declined to waive his rights because he "wanted to speak with a lawyer." Id. at 294. Several officers then transported him to the central police station. Ibid. While en route, two of the officers discussed the risk that students who attended a nearby school for "handicapped children" "might find a weapon" and "hurt themselves." Id. at 294-95. Innis interrupted the conversation and told the officers to "turn the car around so he could show them where the gun was located." Id. at 295. When the police again advised him of his rights, he replied that he "wanted to get the gun out of the way because of the kids in the area in the school." Ibid. Innis then led the officers to the shotgun. Ibid.

13

The United States Supreme Court explored the meaning of "interrogation" in that context. The Court held that Miranda's safeguards applied not only to express interrogation of a suspect in custody but also to "its functional equivalent." Id. at 300-01. As to the latter category, the Court explained that interrogation refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301.

The Court divided over the application of the standard. By a vote of 6 to 3, the majority found that, although Innis was subjected to "subtle compulsion," the above standard had not been met. Id. at 303.

The Court applied the Innis standard again in Arizona v. Mauro, 481 U.S. 520 (1987). Once again, a divided Court concluded that the defendant, Mauro, had not been interrogated by the police. Id. at 527. Mauro admitted to the police that he had killed his son. Id. at 521. He directed them to the child's body but declined to make additional statements without a lawyer. Id. at 522. Meanwhile, Mauro's wife asked the police if she could speak with her husband. Ibid. An officer took her to Mauro and remained in the room; the officer visibly recorded the conversation, which the prosecution later played at trial. Id. at 522-23.

Five justices concluded the circumstances "were far less questionable than the 'subtle compulsion'" that was not found to be an interrogation in Innis. Id. at 529. The majority added that "Mauro was not subjected to compelling influences, psychological ploys, or direct questioning. Thus, his volunteered statements cannot properly be considered the result of police interrogation." Ibid. Four justices critiqued the majority's application of the Innis standard in dissent. See id. at 530 (Stevens, J., dissenting). In their judgment, "the police knew or should have known that Mrs. Mauro's encounter with [her husband] was reasonably likely to produce an incriminating response." Id. at 535.

## C.

New Jersey's privilege against self-incrimination guarantees that "every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate." N.J.S.A. 2A:84A-19; N.J.R.E. 503. Differences between the text of the Fifth Amendment and the state privilege have led to different interpretations. O'Neill, 193 N.J. at 176. Indeed, we have interpreted the state privilege to grant "broader protection than its . . . federal counterpart." Id. at 176-77; see also State v. Maltese, 222 N.J. 525,

15

544 (2015); O'Neill, 193 N.J. at 177-79 (discussing examples from the case law).

This Court has adopted the Innis standard and embraced the view that interrogation includes not only direct questioning but also "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." State v. Hubbard, 222 N.J. 249, 267 (2015) (quoting Innis, 446 U.S. at 301); State v. Bey, 112 N.J. 45, 68 n.13 (1988). We continue to apply the Innis test in accordance with its plain meaning.

IV.

Juveniles receive heightened protections when it comes to custodial interrogations for obvious reasons. Common sense tells us that juveniles -- teenagers and children alike -- are typically less mature, often lack judgment, and are generally more vulnerable to pressure than adults. See J.D.B. v. North Carolina, 564 U.S. 261, 272-73 (2011). For those and other reasons, "the greatest care must be taken to assure that" a juvenile's admission is "voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." In re Gault, 387 U.S. 1, 55 (1967).

16

Parents and other adults play a key role in that regard. As the United States Supreme Court acknowledged long ago, a juvenile in custody who faces questioning needs "support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, may not crush him." Haley v. Ohio, 332 U.S. 596, 600 (1948). Without guidance from an adult relative, friend, or lawyer, juveniles are simply on an "unequal footing with [their] interrogators" and are not "able to know, let alone assert, [their] constitutional rights." Gallegos v. Colorado, 370 U.S. 49, 54-55 (1962). In the intimidating setting of a police station, parents can serve as advisors and offer support and assistance. See id. at 54.

This Court has stressed the critical role parents have when juveniles are interrogated. In State in Interest of S.H., decided nearly a half-century ago, the Court observed that "[p]lacing a young boy in the 'frightening atmosphere' of a police station without the presence of his parents or someone to whom the boy can turn for support is likely to have harmful effects on his mind and will." 61 N.J. 108, 114 (1972). The Court therefore "emphasize[d that] whenever possible and especially in the case of young children no child should be interviewed except in the presence of his parents or guardian." Id. at 114-15.

The Court built on S.H. in its decision in Presha, which is central to this appeal. Presha took note of the State's shift primarily from rehabilitation of juvenile offenders to an "increased focus on . . . apprehension and prosecution." 163 N.J. at 314. As a result, "the parent's role in an interrogation setting takes on new significance." Id. at 314-15. In particular,

> [w]hen younger offenders are in custody, the parent serves as a buffer between the juvenile, who is entitled to certain protections, and the police, whose investigative function brings the officers necessarily in conflict with the juvenile's legal interests. Parents are in a position to assist juveniles in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an interrogation.
>
> [Id. at 315 (citing Gallegos, 370 U.S. at 54) (emphasis added).]

The Court therefore concluded that an adult's absence from the interrogation room should be considered "a highly significant factor" that is entitled to "added weight when balance[ed] . . . against" the other relevant factors. Ibid. For juveniles under the age of fourteen, the Court imposed a bright-line rule that statements made "when a parent or legal guardian is absent from" the interrogation are not admissible "unless the adult was unwilling to be present or truly unavailable." Ibid.

For all juveniles, the Court instructed that "police officers must use their best efforts to locate a parent or legal guardian before" an interrogation begins.

18

Id. at 316. If "an adult is unavailable or declines to accompany the juvenile, the police must conduct the interrogation with 'the utmost fairness and in accordance with the highest standards of due process and fundamental fairness.'" Id. at 317 (quoting S.H., 61 N.J. at 115).

The Court's recent ruling in A.S. underscored the supportive role parents have in the context of a custodial interrogation. In A.S., the police enlisted the mother of a fourteen-year-old girl, A.S., to help during the interrogation process. They asked the mother to recite the Miranda warnings and did not correct her misstatements. A.S., 203 N.J. at 136. When A.S., for example, asked whether she had to talk if she had a lawyer, her mother replied, "You . . . have to talk"; "[Y]ou have to answer." Id. at 139-40. Although a parent can advise a child to cooperate with the police and even to confess, see id. at 148; State in Interest of Q.N., 179 N.J. 165, 177 (2004), A.S.'s mother repeatedly badgered her into answering the officer's questions despite her "imperfect, child-like efforts to assert her right to" remain silent, A.S., 203 N.J. at 136, 141.

The Court concluded that A.S.'s confession was involuntary and confirmed that a parent's "presence alone" is not what Presha contemplated. Id. at 148, 152. To serve as a buffer between the police and the juvenile, a parent must act "with the interests of the juvenile in mind." Id. at 148. In

19

short, the Court reaffirmed that the purpose of <u>Presha</u> -- to have a parent present during interrogation -- "was to assist the child in the exercise of his or her constitutional rights; it was not to provide the police with an assistant." <u>Id.</u> at 137.

V.

We evaluate A.A.'s statements to his mother while in police custody against that backdrop.

The police contacted A.A.'s mother -- in compliance with <u>Presha</u> -- and summoned her to the police station where A.A. was in custody. When she arrived, the police escorted her to an interview room and told her about the shooting incident and why A.A. was under arrest. She was understandably upset and asked to speak with her son. Rather than bring A.A. to the interview room, the police accompanied his mother to the holding cell and allowed mother and son to speak to one another on opposite sides of the cell's gate in an otherwise open area.

The reason to summon A.A.'s mother was for her to help her son understand his rights and act intelligently in deciding whether to waive them. <u>See</u> <u>Presha</u>, 163 N.J. at 315. But before mother and son began to speak, the police did not advise A.A. of his rights in his mother's presence. Neither A.A. nor his mother had been made aware that anything A.A. might say could be

20

used against him, among other important rights. In that setting, A.A. made critical admissions to his mother that the Family Part judge later relied on. The police did not question A.A. afterward.

Under the circumstances, it was hardly a surprise that A.A. and his mother spoke about the crime for which A.A. had been arrested. The police should have known it was reasonably likely that A.A.'s mother would elicit incriminating responses from him. See Innis, 446 U.S. at 301. Although we find no evidence of bad faith on the part of the police, their words and actions set in motion A.A.'s incriminating statements to his mother. Under Innis, therefore, A.A. was subjected to the "functional equivalent" of express questioning while in custody. Id. at 300-01. His statements, obtained without the benefit of any Miranda warnings, are thus inadmissible.

What took place here upended the model envisioned in Presha. Instead of serving as a buffer to help a juvenile understand his rights, the child's mother unwittingly assisted the police and helped gather incriminating evidence. That runs counter to principles in our jurisprudence set forth in S.H., Presha, and A.S. We base our ruling on state law, which provides more expansive protections against self-incrimination than the Fifth Amendment. See Maltese, 222 N.J. at 544; O'Neill, 193 N.J. at 176-77.

21

The Appellate Division's decision in State in Interest of Stasilowicz, 105 N.J. Super. 151 (App. Div. 1968), does not alter our conclusion. In that case, an attendant at a youth detention facility overheard admissions a juvenile made to his stepfather. Id. at 154. Nothing in the reported decision suggests the admissions stemmed from words or actions of the police in the context of a police interrogation or its equivalent.

## VI.

The protections outlined in Presha remain good law. To reinforce them and avoid what took place here, we add the following guidance. The police should advise juveniles in custody of their Miranda rights -- in the presence of a parent or legal guardian -- before the police question, or a parent speaks with, the juvenile. Officers should then give parents or guardians a meaningful opportunity to consult with the juvenile in private about those rights. See Q.N., 179 N.J. at 182 (Wallace, J., dissenting); A.A., 455 N.J. Super. at 505; see also D.M. v. State, 949 N.E.2d 327, 335 (Ind. 2011); Commonwealth v. Roane, 329 A.2d 286, 289 (Pa. 1974); In re E.T.C., 449 A.2d 937, 940 (Vt. 1982). That approach would enable parents to help children understand their rights and decide whether to waive them -- as contemplated in Presha. If law enforcement officers do not allow a parent and juvenile to consult in private, absent a compelling reason, that fact should weigh heavily in the totality of the

22

circumstances to determine whether the juvenile's waiver and statements were voluntary. See Presha, 163 N.J. at 315.

If legitimate security concerns require the police to observe a private consultation, the police can monitor the interaction without listening to the words spoken between parent and child. See La. Admin. Code tit. 67, Pt V, § 7519(H)(2) (requiring that interview and visiting rooms at juvenile detention facilities "shall allow privacy, yet permit visual supervision by staff"). We note, of course, that law enforcement officers already do not sit in on private meetings between defendants and their lawyers. Cf. N.Y. Comp. Codes R. & Regs. tit. 22, § 34.0, Guideline VIII.5 ("The interview rooms [in court facilities] should provide for visual surveillance by security personnel and should be so constructed that the conversation between the attorney and his client is private.").[1]

---

[1] We decline to address the ACLU's argument that juveniles must be allowed to consult with counsel before they can waive their Miranda rights. A.A. did not advance that claim and, as a general rule, the Court "does not consider arguments that have not been asserted by a party, and are raised for the first time by an amicus curiae." State v. J.R., 227 N.J. 393, 421 (2017) (citing Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n, 91 N.J. 38, 48-49 (1982)).

23

## VII.

Finally, we agree with the Appellate Division that a new hearing is required. A.A., 455 N.J. Super. at 506. The State's case relied on three principal strands of evidence: Officer Labarbera's identification of two men he saw on bicycles shortly before the shooting; video surveillance that depicted three black males riding bicycles near the crime scene; and A.A.'s admissions. The Family Part judge pointedly relied on A.A.'s statements to establish his whereabouts at the time of the offense as well as his motive. Because the pivotal admissions were "clearly capable of producing an unjust result," R. 2:10-2, we reverse the adjudication of delinquency and remand for a new hearing.

## VIII.

For the reasons outlined above, we affirm the judgment of the Appellate Division and remand to the Family Part for further proceedings.


JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON and TIMPONE join in CHIEF JUSTICE RABNER's opinion.